275 So.2d 692

Harvie D. **RENFROE**

v.

**STATE.**

**7 Div. 171.**

Court of Criminal Appeals of Alabama.

March 13, 1973.

Rehearing Denied April 3, 1973.

Bolton, Sizemore & Rumsey, Sylacauga, for appellant.

William J. Baxley, Atty. Gen., and L. G. Kendrick, Asst. Atty. Gen., for the State.

**TYSON, Judge.**

The appellant was indicted for the first degree murder of his wife, Betty Culver Renfroe, by choking or strangling her with a shirt. The Jury's verdict found the appellant guilty of murder in the second degree, and judgment set sentence in accordance with the verdict at ten years imprisonment in the penitentiary.

The record here is in Five Volumes, comprising some 942 pages. Because of this, and our ruling, as herein set forth, an abbreviated statement of facts will here suffice.

The appellant, Harvie D. Renfroe, testified that on the morning of June 24, 1971, he awoke at his residence with his wife, near Lincoln, Alabama, that she fixed breakfast, and, shortly thereafter, he left, stopping for gasoline about three miles from his home, then drove to the Sonny King Motor Company in Anniston, Alabama, where he arrived about 9:00 a. m., and stayed for approximately thirty to forty-five minutes talking with two men pertaining to some used cars. On his return, he stopped to talk with a Mr. Harvey Wilson, who was driving a piece of road grading equipment, pertaining to his coming over and grading out the driveway to their new home, he and his wife having moved there on May 21, 1971. Appellant also stated that he drove through the Shell Subdivision, looking for Mr. Ray Shell, who had built his home for him, and returned to his home at approximately 10:00 a. m. When he went into his home, he found his wife clad only in a slip and shortie night gown in which she had slept, with a shirt tied around her neck with a square knot over the larynx, and that her body was "turning blue." The appellant testified that he telephoned Sheriff Brewer immediately, that he also telephoned the County Coroner, Buster Hogan, and that they arrived at his home within approximately thirty minutes to investigate.

State Toxicologist Robert B. Johnson testified that in his opinion "this subject died as a result of strangulation from a ligature in this case a shirt tied around her neck." He further stated that death could occur from strangulation in less than a minute as "unconsciousness results from immediate stopping of the blood to the brain and suffocation actually occurs from the loss of air to the lungs and eventually to the brain." He further stated that he found small bruises about the size of a fingertip on each side of her throat. A test of blood sample indicated that there was no alcohol in the blood. An examination of the contents of her stomach indicated that there were some traces of eggs and bacon, which were in a state of digestion of about one and one half to two hours. He further testified that it takes about two hours for an egg to digest and three to five hours for bacon to digest. He further testified that he did not see any abrasions or other bruises about the body of the deceased, and further testified that he did not take any specimen from underneath the deceased's fingernails, such as scraping, because her nails were short. He further testified that he did not take a swab or go into the vaginal cavity. He stated that the only marks on the body of the deceased were such as might have been there from a woman's possibly bumping into a chair, and there appeared to be a small bruise on the leg more than twenty four hours old. He further testified that he did find some stains of blood on a towel in the bathroom, but in examining a hammer found in the

house, such revealed rust stains, but no blood.

Both he and Sheriff Brewer testified that they did not make any fingerprint tests, and that there were no marks or abrasions on the person of the appellant when they observed him at his home in the course of the investigation.

The State established that the couple had placed a permanent mortgage loan on their new home on June 11, 1971, in the amount of $13,000.00, with the First Federal Savings and Loan Association of Sylacauga, Alabama. The State further brought out that there was a credit life insurance policy issued on each, the proceeds thereof had paid off the mortgage loan after the death of the deceased in August, 1971; that the appellant had made only two payments on this mortgage.

There was evidence that the appellant's wife, Betty Culver Renfroe, who was his second wife, had had some difficulty with the appellant's daughter by his first marriage pertaining to the care and residency of the younger child of the appellant's first marriage. There was also evidence that the deceased had a heart murmur and had at least two physicians recommend to her that she have heart surgery. The evidence also showed that on the day prior to her death, following a shopping trip in town, she had been examined by a local physician on the late afternoon of June 23, 1971, and that he had prescribed some medication to make her sleep easier that evening, but had also noticed a heart condition.

The State brought out that two days prior to her death, the deceased had telephoned a transfer and storage company requesting that they move her, but had cancelled this request on the morning of June 23, 1971.

Because of our opinion, as hereinafter set forth, we do not deem it necessary at this juncture to pass upon the weight or sufficiency of the evidence in this cause.

I

Prior to trial, the appellant filed a motion to quash the indictment, averring in essence, ". . . [T]he only way that the Court would have known whether or not that there was evidence of a competent witness—not to the sufficiency of it—but the only way I think the Court would know if a competent witness appeared before the Grand Jury would be for that witness, whoever, each and everyone that appeared before the Grand Jury to restate to the Court the testimony given before the Grand Jury."

The State presented a number of witnesses who testified they had appeared before the Grand Jury and given evidence in this cause, and we feel that the trial court here correctly did not allow the appellant, prior to trial, to require each of these witnesses to relate the essence of their testimony before the Grand Jury. Title 30, Section 86, Code of Alabama 1940; Fikes v. State, 263 Ala. 89, 81 So.2d 303; Loyd v. State, 279 Ala. 447, 186 So. 2d 731, and cases cited therein.

II

The appellant also filed a motion for change of venue averring certain pretrial publicity. A number of recent authorities dealing with such an averment may be found in Flowers v. State, 47 Ala.App. 613, 259 So.2d 300.

However, here, the appellant's motion was not verified by affidavit under oath, as required by law, hence, the trial court properly sustained the State's demurrer to this motion. Huckabee v. State, 168 Ala. 27, 53 So. 251.

III

The appellant had also attacked the statement given to Sheriff Brewer and State Investigator Lt. Riddle on the basis that there had not been here given a prop-

er 'Miranda warning, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The appellant had signed a waiver of counsel, which is as follows:

## "STATE'S EXHIBIT NO. 21

## "WAIVER OF COUNSEL BY DEFENDANT IN CUSTODY

"I, /s/ Harvie D. Renfroe, have been informed by the undersigned law enforcement officers, prior to being questioned by them, that I am suspected of the offense of <u>Murder</u> in <u>Talladega</u> County, Alabama, on the 24 day of Jan., 1971, and have been informed by them of my Rights as follows:

"1. That I may remain silent and do not have to make any statement at all.

"2. That any statement which I might make may be used against me in Court.

"3. That I have a right to consult with an attorney before making any statement and to have such attorney present with me while I am making a statement.

"4. That if I do not have enough money to employ an attorney, I have the right to have one appointed by the Court to represent me; to consult with him before making any statement; and to have him present with me while I am making a statement.

"5. That if I request an attorney, no questions will be asked me until an attorney is present to represent me.

"After having my Rights explained to me, I freely and voluntarily waive my right to an attorney. I am willing to make a statement to the officers. I can read and write the English language and fully understand my Rights to an attorney. I have read this Waiver of Counsel and fully understand it. No threats or promises have been made to me to induce me to sign this Waiver of Counsel and to make a statement to the officers.

"This 24 day of Jan., 1971. 1:45 PM

/s/ Harvie D. Renfroe

"All of the Rights in the above Waiver of Counsel were read and explained to the above defendant by me and he freely and voluntarily waived his right to an attorney. No threats, promises, tricks, or persuasion were employed by me or anyone in my presence to induce him to waive his rights to an attorney and to make a statement without an attorney. He freely and voluntarily signed the above Waiver of Counsel in my presence after having read it.

"By

/s/ R. Riddle

Lt. Ala. State

Investigator

(Title)

"Witnessed by:
"/s/ Luke Brewer

————————"

■ The appellant specifically insists that he was not adequately advised of his right to counsel before making a subsequent statement to the investigating officers, Lt. Riddle and Sheriff Brewer. In the course of Lt. Riddle's testimony: "[I]f he couldn't afford one we would furnish him one." The appellant argues that the term *"we"* meant the investigators rather than the State. From a reading of the entire testimony of Lt. Riddle, we do not accord the emphasis to the term "we" as emphasized by the appellant; rather, we believe that the appellant, having signed the waiver hereinabove set forth, Riddle intended to mean the State rather than the officers individually.

■ The appellant further argues that at a subsequent point in time when an additional statement was taken from the appellant, it included the term, "[*I*]*f* I am entitled to a lawyer present and *if* I wish

to have one present, I will not be questioned till one is present." However, this second statement was taken *after* the appellant had fully read, understood, and voluntarily signed the waiver of counsel above quoted. We therefore are of the opinion that the futuristic aspect of the appointment of counsel, as discussed in Square v. State, 283 Ala. 548, 219 So.2d 377, is not here present. Gamble v. State, 48 Ala.App. 605, 266 So.2d 817.

## IV

■ The appellant asserts that the following, found in Volume Five, Record page 915, constitutes a denial of his right to a public trial:

"THE COURT: We are fixing to lock the doors to the courtroom so no one will be able to enter and no one can leave. So, if any of you will have to leave prior to the Court finishing the charge—now is the time for you to leave. We will not permit you to leave at any other time. Let me see the lawyers in the library for just a minute.

"(HERE FOLLOWED THE COURT'S ORAL CHARGE TO THE JURY)"

As may be seen, there was no objection or exception, or other motion made by the appellant to the court's instruction to its bailiff. Moreover, as we read the record, the able trial judge was simply allowing those persons in the courtroom to exit or other persons to enter as they desired prior to the time of the court commencing its oral charge to the jury. An order to lock the door for such an interval to prevent disruption in its charge so long as persons, as here, are present within the courtroom was properly a matter for the trial court's discretion and did not prevent a public trial within the sense of constitutional requirements. Lide v. State, 133 Ala. 43, 31 So. 953; Bishop v. State, 19 Ala.App. 326, 97 So. 169; Wade v. State, 207 Ala. 1, 92 So. 101.

## V

■ Following the appellant's testimony in his own behalf, and an extensive cross-examination, certain matters were brought out on redirect examination of appellant, and following this we find the following exchange:

"RECROSS EXAMINATION———— DISTRICT ATTORNEY

"Q. I just have one question—tell this jury whether or not you went to talk to Lawyer X (attorney) about getting your wife committed to Bryce's and—

"MR. BOLTON: Your Honor, I object to that. It's confidential, and he knows that it's confidential information—discussion he had with a lawyer.

"THE COURT: Approach the bench please. Do you know who—

"MR. BOLTON: I have no idea—did Mr. X (Attorney) tell you?

"DISTRICT ATTORNEY: No, he didn't.

"ASSISTANT DISTRICT ATTORNEY: He told me.

"MR. BOLTON: Take the stand—this is in the presence of the jury, and I move for a mistrial at this time. The Assistant District Attorney said it in the presence of the jury.

"THE COURT: *You asked him.*

"DISTRICT ATTORNEY: 'Mr. Bolton's the one that's done the talking.

"THE COURT: O.K. take the jury out for a minute. (BAILIFF TAKES THE JURY OUT OF THE PRESENCE AND HEARING OF THE COURTROOM)"

As may be seen in examining the above exchange, the Assistant District Attorney, being unsworn, volunteered certain information in the presence of the jury, which information was not only rank hearsay, but

violative of one of the most sacred relationships within the law, namely, that of the attorney-client privilege.

Our Supreme Court in Simon v. State, 181 Ala. 90, 61 So. 801, per De Graffenried, J., stated:

". . . It was, however, unfortunate that counsel for the state, in cross-examining the defendant while he was testifying as a witness in his own behalf, asked him a question which not only called for illegal and irrelevant testimony, but which question, without an answer, carried with it an inference which only tended to prejudice the jury against the defendant. It was also unfortunate that in his argument to the jury counsel for the state made a remark which was not only not authorized by the evidence, but which was calculated to inflame the jury against the defendant. When a great crime has been committed the law casts upon the solicitor grave responsibilities, and he realizes that the state looks largely to him to see that the perpetrator of such crime is properly and legally punished. In such a case, especially during the excitement of the trial, counsel on both sides sometimes unconsciously say things, and ask questions, which the strict letter of the law does not warrant. In the present case the solicitor had before him a case of great enormity, and was prosecuting a crime, the details of which were sufficient to arouse the indignation of all law-abiding men, and in such extreme cases counsel, as we have already said, are liable to forget themselves. The law—human and divine—is, however, the salt that has saved humanity from barbarism: and courts and officers of courts in their efforts to enforce the law, even in extreme cases, should, if possible, so guard their utterances that they may be sure that they themselves do not impinge the law which they are seeking to enforce."

Our Supreme Court, through our beloved former Chief Justice Livingston, C. J., in Stain v. State, 273 Ala. 262, 138 So.2d 703, quoted with approval the following from Cassemus v. State, 16 Ala.App. 61, 75 So. 267, 268:

" ' * * * A defendant is entitled to a fair trial by jury according to the law and the evidence, and such trial should be free from any appeal to prejudice or other improper motive. It would appear that the learned and upright judge before whom this trial was conducted did all in his power to right the wrong occasioned by the improper and untimely remarks of the solicitor; it cannot, however, be seriously doubted but that the poison that had been injected would be difficult to eradicate; and in this case, when all the facts are taken into consideration, it does not clearly appear that a perfectly fair trial, without undue burden, prejudice, and bias, was accorded the defendant, and therefore the court was in error in overruling defendant's motion for a new trial. * * * ' "

After extensive deliberation in the case at bar, it was necessary for the able trial judge to further charge the jury beyond his original instructions, and we cannot here determine precisely how much the poisonous effect of the voluntary statement of the Assistant District Attorney may have had in the minds of the jury. We cannot say with fair assurance that the jury was not substantially swayed by the Assistant Prosecutor's statement, even though the learned trial judge did all that he could to eradicate it from their minds. The overruling of appellant's motion for a mistrial was therefore prejudicial error. Watts v. Espy, 211 Ala. 502, 101 So. 106; Bozeman v. State, 25 Ala.App. 281, 145 So. 165; Cassemus v. State, 16 Ala.App. 61, 75 So. 267; Emerson v. State, 30 Ala.App. 248, 4 So.2d 183, cert. granted 241 Ala. 383, 4 So.2d 186 (reversed on other grounds); Burch v. State, 32 Ala.App. 529, 29 So.2d 422, cert. stricken 249 Ala. 72, 29 So.2d 425; Stain v. State, supra.

The giving of a negative answer following the question to the appellant did not

render such matter harmless. Dredd v. State, 26 Ala.App. 594, 164 So. 309; Commander v. State, 28 Ala.App. 42, 178 So. 241. See also Tell v. State, 285 Ala. 234, 231 So.2d 107.

We pretermit consideration of other assignments of error raised in brief as they are not likely to occur in retrial of this cause.

For the reasons set out herein, the judgment of conviction is due to be reversed and the cause is hereby remanded.

Reversed and remanded.

ALMON, HARRIS, and DeCARLO, JJ., concur.

CATES, P. J., concurs in result.