318 So.2d 329

James MADISON, alias

v.

STATE.

2 Div. 140.

Court of Criminal Appeals of Alabama.

April 22, 1975.

Rehearing Denied May 27, 1975.

William J. Baxley, Atty. Gen., and Joseph G. L. Marston, III, Asst. Atty. Gen., for the State.

BOOKOUT, Judge.

The appellant was indicted on a charge of first degree murder, convicted of second degree murder and sentenced to twenty-five years in the penitentiary.

The evidence shows that the appellant caused a shotgun he was holding to discharge, and the shot struck his four-month-old daughter, killing her. His wife, who

Philip Henry Pitts, Selma, for appellant.

was holding the child, was wounded. Appellant had been visiting a drinking establishment in Greensboro on June 12, 1971, and had possibly three to five cans of beer over a period of two or two and one-half hours.

While there, his wife came by and asked him to come home and left two of his sons with him, which he interpreted as being for the purpose of seeing that he did not linger at the bar too long. His wife then went to his mother's store and shortly thereafter the appellant left the "beer joint" with his sons in his truck. He stopped by his mother's store and then drove home. When his wife did not arrive by supper time, he and the boys started out again in the truck, but passed his wife, who stopped and took the two boys in her car and drove to his sister's house. The appellant returned home, but his truck broke down shortly before reaching there, and he walked the rest of the way home.

Appellant contends he took his shotgun and walked down to the woods near his house where his dogs were running and barking. He saw his wife drive up to the house and he went back to meet her. She was sitting in the car with the children. The baby was in an infant car seat and began crying. The appellant's wife put the baby over her shoulder while appellant was talking to her. He was agitated about his truck breaking down and stated that he ought to tear up the car also, at which time he hit the outside rear view mirror with the barrel of his shotgun. It discharged, hitting the baby and his wife. Appellant hysterically drove his wounded wife and baby to the Hale County Hospital in Greensboro. The child died shortly after their arrival, the wife was transferred to Tuscaloosa to another hospital, and the appellant, still in hysterics, had to be forcibly held down and sedated.

The appellant made a statement to investigating officers while in jail in the early morning hours of June 13, 1971. Over objection, that statement was testified to and was in conflict in some details with the version given by the appellant at the trial. In his statement in jail, he said he had gone in the house and had gotten the gun because he thought some of his wife's relatives were coming over to beat him up. During the trial, he stated that he did not remember talking to the investigating officers at the jail at all and did not remember making such a statement.

Witnesses who saw the appellant at the hospital testified he was in hysterics, had to be held down and tied down on a stretcher, and sedated. He was seen yelling and crying outside the hospital as well as inside, repeating statements such as:

"My God, I've shot my baby.

. . . . . .

"I have killed my baby.

. . . . . .

"I shot my baby.

. . . . . .

"God, don't take my baby, take my life, but don't take my baby.

. . . . . .

"Lord, I done killed my baby.

. . . . . .

"I killed my child."

Appellant's wife testified to substantially the same facts as he did. She did not hear him say anything but, "the God-damned truck," prior to the shot, then he began screaming he had shot his baby and rushed them to the hospital in Greensboro. She was transferred to a hospital in Tuscaloosa where she stayed for over a month. She said they were not having any particular difficulty on that day, and she moved back in with the appellant and their other children when she was released from the hospital and was still living with him at the time of the trial.

Law enforcement officers testified as to the scene of the killing and as to the condition of the shotgun when found, which had its safety on. The side rear view mirror of the car was broken and glass

matching the mirror was found at the scene of the shooting. Appellant had testified the safety on the gun automatically came on when it was cocked and that he did not have his finger on the trigger when the gun discharged. Other witnesses stated the gun had accidentally discharged at prior times when jarred or being set down on the stock. A firearms expert testified for the appellant that the gun would accidentally fire when a foreign object was placed in a certain position inside the gun. He could not make the gun fire from a bump or jar without a foreign object inside. A state toxicologist was recalled in rebuttal and testified that he could not make the gun accidentally discharge without pulling the trigger after many attempts to do so with the safety both on and off.

A number of other witnesses were called by the appellant who testified as to his good character and his reputation for truth and veracity.

I

■ The charge against the appellant being first degree murder, the question for the jury to determine was whether the shooting was, (1) willful, deliberate, malicious and premeditated, or (2) with malice but without deliberation or premeditation, or (3) a voluntary act without malice amounting to first degree manslaughter, or (4) accidental under such circumstances to be second degree manslaughter, or (5) simple negligence not amounting to a crime.

■ The jury returned a verdict of murder in the second degree, thus acquitting appellant of premeditated murder, but finding as a necessary element that the act was done with malice. From our review of the record, the evidence did not establish premeditation on the part of the appellant. From the evidence, the jury could just have easily returned a verdict of first degree manslaughter as second degree murder. Therefore, the element of malice is a crucial ingredient in this case and one which must be examined in the light of not only the legal evidence presented, but any matter coming to the attention of the jury which may have swayed them toward that conclusion.

If the prosecution could establish that the appellant was mad at his wife when she returned home, that he made threats to shoot her, and then fired the gun; then the evidence would clearly put before the jury a case of one of the degrees of murder. On the other hand, if there was no evidence that the appellant was mad at his wife, no evidence of a threat or an argument, but only that he was aggravated over his truck breaking down, the case for murder weakens.

The only witnesses to the shooting were the appellant, his wife and their small children. The only testimony as to the actual circumstances of the shooting was from the appellant and his wife. Their stories are almost identical in detail: that there was no argument; the appellant was angry over his truck breaking down; he hit the car mirror with the gun while cursing his truck; the gun fired and the appellant sped his wife and baby to the hospital in a state of hysteria which lasted until he was sedated. Other evidence seemed to support these facts, i. e. the broken mirror, the gun found in the yard, testimony from the examining physician, and testimony from other witnesses at the hospital.

■ The appellant's contention that the gun fired while the safety was on and without him touching the trigger was challenged by the toxicologist's experiments with the gun. Other witnesses said the gun had accidentally discharged in the past. This testimony along with statements from a firearms expert could properly be considered by the jury in reaching their verdict.

■ From all the evidence, the jury could possibly infer malice, but it would be a close decision. Therefore, any extraneous matter bearing on malice coming to the jury's attention could be highly prejudicial to the appellant and must be

carefully scrutinized by this Court. The trial court attempted throughout the trial to see that only proper and legal evidence came before the jury.

The trial was peppered throughout with heated arguments between counsel; with admonitions from the trial judge to both counsels; by threats to hold counsel in contempt; and by an offer from an assistant district attorney to defense counsel to settle their argument outside with fisticuffs. Such was the atmosphere throughout much of the trial. Counsel for appellant made repeated objections on grounds that remarks of the prosecutors were improper, one such remark being made outside the hearing of the court reporter, but supposedly within the hearing of the jury. In essence, appellant contends that while the trial court sustained many of his objections and instructed the jury not to consider some of the statements made, nevertheless, remarks were made in the presence of the jury which were not capable of being eradicated from their minds.

This Court must, therefore, carefully review the conduct complained of in light of the authorities cited by both the appellant and appellee, balancing the presumptions in favor of the correctness of the verdict against the effect such conduct would have on appellant's receiving a fair trial.

## II

During the course of the State's case, E. C. Kimbrough, a State Investigator, was called as a witness. He testified out of the presence of the jury as to the voluntariness of the appellant's statement to him at the county jail. The court found the statement to have been voluntarily given after appellant had been warned of his constitutional rights. The witness then testified from his notes, in the presence of the jury, as to what the appellant had told him.

On redirect examination, the prosecution asked the witness if he had some notes from a conversation he had with the appellant's two small sons, Clay and Scott Madison, who were four and five years old. The investigator said he had such notes which were marked for identification by the court reporter. Upon objection by the appellant, the court refused to allow the notes into evidence and, likewise, refused to allow the witness to testify from those notes, stating:

"I don't think a statement of a five year old or a four year old would add any probative value to this trial and I'm not going to admit it."

Much later in the trial, during the State's cross examination of the appellant, the following occurred:

"Q. Let me ask you this, did you make this statement, did you make the statement that Tracy Joe Madison was killed, 'I'll shoot you if you don't leave?'

"A. I would never say that.

"Q. Did you make that statement?

"A. No, I would never say that.

"Q. Are you aware of the fact that one of your son's (sic), Clay Madison——

"MR. HENRY PITTS: (Interposing) Objection, your Honor.

"Q. (By Mr. Faile, continuing:)——stated that you did make that statement?

"MR. HENRY PITTS: Objection, your Honor, I object to that as incompetent, irrelevant and immaterial.

"THE COURT: Yes, sir; I'll sustain it.

"MR. HENRY PITTS: And I want to make a motion outside the presence of the jury.

"THE COURT: All right. Mr. Bailiff, take the jury back to the Jury Room.

"(Whereupon the following proceedings were held out of the presence and hearing of the jury.)

"MR. HENRY PITTS: Your Honor, once again I want to make a motion for a mis-

trial on the grounds that the statement made by Mr. Faile, the question asked by Mr. Faile he knew good and well, being a good lawyer as Mr. Faile is, he knows that it is improper evidence, it's irrelevant, incompetent and immaterial and he can't try to impeach this witness over a statement made by a third party, much less a statement made by a four or five year old child and it was only made for one purpose and that's to try to inflame the passions of this jury or prejudice this jury against this Defendant.

"I don't think there's any way you can instruct this jury coupled with other statements made by Mr. Burke and Mr. Faile earlier this morning about the character witness, then he comes back in here again this afternoon and asks the statement which he knows under any evidentiary procedure is not competent evidence and could only be asked for one purpose and that purpose alone is to try to prejudice this jury against this Defendant.

"THE COURT: All right. I want to say something for the record. This is outside the presence of the jury and I want to state that we've been two years trying to get this case tried. We've had one mistrial and I've granted continuances and at least one of the occasions for granting of mistrial was due to the conduct of the District Attorney.

"I'm stating categorically at this time the conduct of the District Attorney that I'm talking about was not in the Courtroom, it was in failing to live up to his agreement to deliver certain documents and according with the agreement that he had with counsel for the other side. There's no reflection on your Courtroom conduct, Mr. Faile, but I'll say this, that I'm going to try every way that I can to get that out of the minds of the jury, but if there is one more attempt on the part of the State to put frosting on this cake that shouldn't be on it, I'm going to declare this mistrial and it won't be tried again by this Trial Judge in this county, I want that thoroughly understood.

"MR. FAILE: Yes, sir; we understand that. I'm asking it for impeachment purposes, I'm not trying to get it in for—

"THE COURT: That's not proper impeachment.

"MR. MORROW: Judge, this is a statement the witness made, we want it clear in the record.

"THE COURT: I'm not going to allow the statement of this witness to be impeached by a statement of a four year old child.

"MR. HENRY PITTS: He was asking him was he aware of his four year old child making a statement to the State Investigator and that's what he was asking him about. It didn't have anything to do with the statement made by this witness.

"He's trying to impeach this witness by a statement made by somebody else, a child.

"THE COURT: A four year old child.

"MR. MORROW: Out of the mouths of babes comes—

"THE COURT: Four year old child is not competent to testify and if there is one more repetition of this, I'll end the trial.

"MR. MORROW: Judge, you're ruling that the child is not competent to testify?

"THE COURT: I certainly am.

"MR. MORROW: For either side?

"THE COURT: For either side.

"MR. MORROW: That's fine.

"THE COURT: I don't think a four year old child, a child that is now six years old, was four years old at the time, can add any probative value to anything in this case. I've got a six year old granddaughter and I don't think she could tell me a thing that would be valid about something that happened two years ago.

640

"I'm certainly not to clutter up this record with that kind of thing and I think it's entirely discretionary with the Trial Judge and I don't feel it would have any probative value and I'm not going to allow it from either side.

"It's going to be objectionable to bring any testimony in from that child.

"MR. FAILE: Does it mean that we won't have the opportunity to make an attempt to qualify that child to testify?

"THE COURT: No, sir; it would not. The child at that age is not qualified to testify unless the Trial Court directs it to be so and I don't think under any theory of the law that I would ever say that a child of that age was competent to testify in any case.

"MR. FAILE: All right.

"THE COURT: What is sauce for the goose is sauce for the gander, they won't be able to either.

"MR. HENRY PITTS: You're denying the motion for a mistrial?

"THE COURT: I'm denying the motion for a mistrial.

"MR. HENRY PITTS: Are you going to instruct the jury?

"THE COURT: I'll instruct the jury.

"(Whereupon the following matters were held in the presence and hearing of the jury.)

"THE COURT: Ladies and gentlemen of the jury, the Court is instructing you to disregard the last question or any answer that might have been made thereto. It has nothing to do with any admissible evidence in this case. Just disabuse your minds of any such statement, it is not evidence and you are not to consider it as such.

"All right, proceed."

The court's refusal to grant a mistrial due to the above-quoted occurrence is set out as ground numbers 59 and 60 in the appellant's motion for a new trial, and is properly before this Court for consideration.

■ Our appellate courts have held that no iron-clad rule exists by which the prejudicial qualities of improper remarks of counsel can be judged. Such depends upon the issues, parties, and general circumstances of the particular case. *Anderson v. State,* 209 Ala. 36, 95 So. 171 (1922); *Langley v. State,* 32 Ala.App. 163, 22 So.2d 920 (1945); *Blue v. State,* 246 Ala. 73, 19 So.2d 11 (1944).

■ In *Langley,* supra, the Court of Appeals restated a general rule earlier set forth by our Supreme Court relative to improper argument of counsel, which we think may equally apply to an improper remark before the jury during any phase of the trial:

"And in the opinion in the case of *Birmingham News Co. v. Payne,* 230 Ala. 524, 162 So. 116, 117, that court said: 'Arguments of counsel to the jury, requiring the granting of a mistrial, or the granting of a new trial on motion, must not only be (1) improper and illegal, but (2) of such prejudicial character as that its probable effect is ineradicable by exclusion and rebuke on the part of the court,' citing *Anderson v. State,* supra, and a number of other cases."

In *Allred v. State,* 291 Ala. 34, 277 So.2d 339 (1973), the Alabama Supreme Court stated, at page 38, 277 So.2d at page 342:

"It is a general rule that where prejudicial statements are made in the heat of argument, even though improper, in accommodation of our adversary system, such statements are considered capable of being eradicated by the trial judge in sustaining objections thereto or by appropriate instructions to the jury or both.

Dunn v. State [277 Ala. 39, 166 So.2d 878], supra. See also *Arant v. State,* 232 Ala. 275, 167 So. 540. But our cases also recognize that an exception to this rule exists where, irrespective of the best efforts of the trial judge to disabuse the mind of the jury of any prejudicial impression, the conviction obtained is not in an impartial atmosphere. *Blue v. State,* supra. See also *Pointer v. State,* 24 Ala.App. 23, 129 So. 787; *DuBose v. State,* 148 Ala. 560, 42 So. 862."

Again in the recent case of *Taylor v. State,* Ala.App., 308 So.2d 714 (1975), Judge Tyson, speaking for this Court, reversed the conviction due to a prejudicial statement of fact being made by the prosecution in argument, stating:

"Where, as here, counsel for the State states to the jury facts of which there are no evidence whatever, and such facts are of a character that are calculated to impress the minds of the jurors, and to injure the opposing party, such are clearly improper argument and grounds for reversal . . . . "

Statements by prosecutors of facts not in existence, or which have been excluded from evidence, are improper per se. Such statements are grounds for reversible error where their impact upon the jury would be so prejudicial that proper instruction by the trial court would not eradicate their prejudicial effect. Where the objectionable statement is made as a fact, unsupported by any legal evidence, pertinent to the issue, and its natural tendency is to influence the finding of the jury, there is sufficient ground for a reversal. *Nix v. State,* 32 Ala.App. 136, 22 So.2d 449 (1945); *Dollar v. State,* 99 Ala. 236, 13 So. 575 (1892); *Dunmore v. State,* 115 Ala. 69, 22 So. 541 (1896); *Sullivan v. State,* 66 Ala. 48 (1880); *Hill v. State,* 20 Ala.App. 158, 101 So. 159 (1924). Also see, *Cook v. State,* 42 Ala. App. 270, at pp. 279, 280, 160 So.2d 884,

cert. denied 276 Ala. 702, 160 So.2d 897 (1963), as to bearing prosecutor's illegal statement might have had between possible verdict of manslaughter or murder.

In the instant case, the trial court had excluded testimony concerning a purported statement by appellant's four and five-year-old sons relative to the shooting incident. Such is clearly within the discretion of the trial court. The court had prevented the District Attorney from going into those statements, yet later in the trial when there had been no evidence of a threat by appellant to his wife, the District Attorney on cross examination asked the appellant if he had not stated to his wife "I'll kill you if you don't leave." When appellant denied making such a threat, the District Attorney then injected, over objection, "Are you aware of the fact that one of your son's (sic), Clay Madison . . . stated that you did make that statement?"

We find this statement to go beyond all bounds of legitimate cross examinations, under the circumstances of this case. The District Attorney in his zeal to contradict the appellant's testimony, in effect himself testified as to the statement of appellant's son which had previously been denied admission into evidence. As previously discussed, any inference that a quarrel had taken place between appellant and his wife, or that he had threatened her in any way prior to the shooting, would be most critical to a jury in reaching a verdict of second degree murder as opposed to manslaughter. We, therefore, are of the opinion that under these particular circumstances, even the prompt and conscientious instructions of the trial court to the jury would be insufficient to eradicate the prejudicial effect of the statement from the minds of the jury. See *Renfroe v. State,* 49 Ala.App. 713, 275 So.2d 692.

Reversed and remanded.

All the Judges concur.