Oscar HARRIS, Jr., Petitioner-Appellee,

v.

Larry SPEARS, Warden, Staton Correctional Center and Charlie Graddick, Attorney General for the State of Alabama, Respondents-Appellants.

No. 79–1184.

United States Court of Appeals,
Fifth Circuit.

Nov. 16, 1979.

Charlie A. Graddick, Atty. Gen., John Gibbs, Asst. Atty. Gen., Montgomery, Ala., for respondents-appellants.

Delores Boyd, Montgomery, Ala., Eric Lieberman, New York City, for petitioner-appellee.

Before COLEMAN, RONEY and FAY, Circuit Judges.

RONEY, Circuit Judge:

Oscar Harris, Jr. was convicted by a jury in Alabama of murder in the second degree and sentenced to forty-five years imprisonment. Without ruling on the merits of Harris' claims, the Alabama appellate court affirmed the conviction because Harris did not properly preserve error for review by objecting during trial or stating with ade-

quate specificity the grounds for his motion for new trial. *Harris v. State*, 347 So.2d 1363 (Ala.Cr.App.), *cert. denied*, 347 So.2d 1368 (Ala.1977).

By petition for writ of federal habeas corpus Harris asserted that he had been prejudiced by improper cross-examination when he testified concerning a statement allegedly given by Harris' ten year old son to the police and that he was denied his constitutional right to confront this key witness. The cross-examination elicited from Harris repeated responses that what the prosecutor suggested was Harris' son's incriminating version of the events which occurred on the evening of the killing was a series of lies. The prosecutor did not call the son as a witness, nor did the prosecutor either produce or introduce any statement alleged to have been given the police by the son.

On finding the defendant did not deliberately bypass state procedures, had cause for noncompliance with state procedures and was prejudiced by the cross-examination coupled with the prosecutor's failure to call the defendant's son as a witness, the district court held that Harris' petition for habeas corpus relief was not barred by *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) or *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). We affirm the grant of the writ of habeas corpus.

None of the eight witnesses who testified at trial actually saw defendant Harris fire the shot which killed Harold Wayne Washington. Only defendant's son allegedly saw the shooting.

On the evening of the incident Harold Wayne Washington approached the door of Harris' house in an attempt to deliver a message to Harris. Harris testified he told Harold Wayne to leave. In response Harold Wayne repeatedly shouted to Harris, "shoot me . . ." and reached towards what Harris thought was the black handle of a pistol shoved into Harold Wayne's pants. Harris then went into his house, got his pistol, and returned to the door. When Harold Wayne again reached towards the

"black handle," Harris fired a shot through the open door, then slammed the door shut and called the police. Harris stayed inside his house until the police arrived.

Stating he was afraid for himself and his family because of Harold Wayne's erratic behavior, Harris testified he fired the pistol to scare Harold Wayne, not to kill him. It was only after the police arrived that Harris learned his "warning shot" had killed Harold Wayne.

Harris' petition for habeas corpus relief is founded on the portion of the prosecutor's cross-examination of Harris set forth below.

"Q. Let me ask you this. Do you have a son by the name of Tracy Harris?

"A. Sure do.

"Q. How old is he?

"A. Tracy is about ten.

"Q. Do you know whether or not Tracy gave the police a statement down at the Police Department?

"MR. ALLEN: Now, we object to that.

"Q. Was Tracy taken to Police Headquarters?

"A. I guess he was.

"Q. Do you know whether or not he gave a statement down there?

"A. I don't know, sir.

"Q. Okay. Before you shot Harold was Harold getting ready to leave your door?

"A. No, sir, he wasn't.

"Q. So if your son, Tracy said that he was, he would be lying?

"A. Tracy would be lying.

"Q. Where was Tracy when the shot was fired?

"A. Eating dinner, sir.

"Q. And if Tracy said he was in the living room he would be telling something that is not true?

"A. To my knowledge he would.

"Q. Well, was he in the living room or not?

"A. I just told you I was on the couch when the knock came on the door.

"Q. Do you know where Tracy was?

"A. He had to be in the kitchen eating.

"Q. If Tracy said he was in the living room with you, it would not be true?

"A. No, it wouldn't.

"Q. Okay. And if Tracy said that when Wayne came up to the door and was talking to you and you told him if you don't leave I am going to get my gun and start blowing, that would not be true?

"A. That would be a lie, sir. I have taken this oath and I am swearing the truth.

"Q. Is that true or not, would Tracy be telling something untrue?

"A. Tracy would be lying.

"Q. Your son?

"A. My son.

"Q. And if Tracy said when Wayne went to run away that is when you shot him, that would not be true?

"A. My son didn't say that.

"Q. I am asking you, Mr. Harris, if he said it would it be untrue?

"A. It would be untrue.

"Q. Okay. And if Tracy said you fired two shots, that would be true, wouldn't it?

"A. That would be true. I shot one out the door and one over Aaron's head. If I hadn't shot out there he would have shot in my house and might have hit my family and everything. I tried to shoot up over his head to scare him off.

"Q. And if Tracy said that you shot Wayne because he was just bothering you while you were relaxing, that would be untrue?

"A. Tracy didn't say that.

"Q. I am asking you if he said that would it be untrue?

"A. He didn't say that. It would be untrue.

"Q. It would be untrue?

"A. It would be untrue."

 The district court correctly determined that a failure to object during the cross-examination would be a trial type procedural default involving "trial judgment of [the] lawyer" triggering review under the "cause and prejudice" standard of *Wainwright v. Sykes,* 433 U.S. at 91 n.14, 97 S.Ct. 2497 citing *Henry v. Mississippi,* 379 U.S. 443, 451, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965).

The court held there was cause and prejudice under that standard.

The failure to specify grounds for the motion for new trial, the court held to be a post-trial default involving a decision exercised by the defendant reviewable under the "deliberate bypass" rule of *Fay v. Noia,* 372 U.S. at 398–399, 438, 83 S.Ct. 822. *See Wainwright v. Sykes,* 433 U.S. at 92, 97 S.Ct. 2497 (Burger, C. J., concurring); *Rinehart v. Brewer,* 561 F.2d 126, 129, 130 n.6 (8th Cir. 1977). The court held there was no deliberate bypass under that standard.

Under *Wainwright v. Sykes, supra,* to obtain relief the defendant must show that counsel's failure to raise a contemporaneous objection to the prosecutor's cross-examination of Harris is coupled with cause and prejudice. Prejudice was clear. On review in the state court, *Harris v. State,* 347 So.2d at 1367, the Alabama appellate court said, "[t]here is no doubt and we have so held that questions of this type are hearsay and prejudicial. *Madison v. State,* 55 Ala.App. 634, 318 So.2d 329, *cert. denied,* 294 Ala. 764, 318 So.2d 337 (1975)."

The crux of the prejudice suffered by defendant Harris was the prosecutor's failure to call the defendant's son as a witness to provide appropriate evidentiary foundation for the cross-examination, and to afford the defendant an opportunity to confront the "witness." Had the son been called to testify, the prosecutor's questions would not necessarily have been improper. Without testimony of the son, however, the prosecutor's highly suggestive questions were based on unsworn statements which were not in evidence. No proof was ever offered that the statements the prosecutor attributed to the son were actually made, so of course they were not subjected to the test of cross-examination as required by the Sixth Amendment. *See Davis v. Alaska,* 415 U.S. 308, 315–316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). These are precisely the type of statements Alabama courts have found ineradicably prejudicial. *Madison v. State,* 318 So.2d at 336–337.

In *Madison v. State* the trial court had determined that statements given to the

police by the defendant's four year old son were inadmissible. Nevertheless the prosecutor referred to the son's statements while cross-examining the defendant. Reversing Madison's conviction for second degree murder, the Alabama Criminal Appeals court criticized the prosecutor's cross-examination and said,

> Statements by prosecutors of facts not in existence, or which have been excluded from evidence, are improper per se. Such statements are grounds for reversible error where their impact upon the jury would be so prejudicial that proper instruction by the trial court would not eradicate their prejudicial effect. Where the objectionable statement is made as a fact, unsupported by any legal evidence, pertinent to the issue, and its natural tendency is to influence the finding of the jury, there is sufficient ground for a reversal. (cases omitted)

*Madison v. State*, 318 So.2d at 336–337.

■ The constitutional error occurred, however, not when the questions were asked, but when the son was not called. An objection at the time of questioning would have been little more than an objection to the order of proof. The precise basis for defendant Harris' objection did not ripen until the close of evidence when the prosecutor's option to call the son as a witness was foreclosed. By that time it was too late to save the trial by instructions under Alabama's own rule. *Madison v. State, supra*. Therefore the whole purpose of the contemporaneous objection rule is thwarted by arguing that it applies here. There was adequate cause for noncompliance with the contemporaneous objection rule. No plausible advantage derived from defendant's failure to object during cross-examination.

■ As to the motion for a new trial at the close of the case, the defendant's failure to properly set forth grounds for new trial was apparently a combination of ignorance of practice and the failure of the court to give him adequate time. The attorney's default apparently stemmed from inadvertent mistake or neglect or the press of circumstance. The following colloquy took place in open court.

THE COURT: Is that all?

THE DEFENDANT: It is taking my rights. I was acting in self-defense and it is just taking my rights. . . I think I should have another trial or something, because the evidence was cloudy. I don't like the way the evidence came out. He convicted me himself, not on the evidence.

\* \* \* \* \* \*

THE COURT: Now, just a minute.

THE DEFENDANT: I was acting in self-defense, Your Honor. God knows this. No man in this Court knows what happened that night but me and God and the dead fellow. We know. Nobody else can predict what happened, no witnesses. There was no witnesses, Your Honor. I don't think it is fair, Your Honor.

THE COURT: Is there anything else?

THE DEFENDANT: I don't think it is fair.

THE COURT: The Jury found you guilty of Murder in the Second Degree and sentenced you to forty five years imprisonment in the penitentiary. The Jury having found you guilty of Murder in the Second Degree and sentencing you to forty five years imprisonment in the penitentiary, the Court now finds you guilty of Murder in the Second Degree and sentences you to forty five years imprisonment in the penitentiary. Notice of Appeal given?

MR. ALLEN: I would move, Your Honor, for a new trial and for the verdict to be set aside. The verdict is contrary to the law and evidence in the case.

THE COURT: Notice of Appeal given. You want the sentence suspended pending an appeal?

MR. ALLEN: Yes, sir.

THE COURT: Of course, he will have to stay in jail.

The Court's statement "Notice of Appeal given" effectively closed off the opportunity to present the motion fully. The record shows the trial court apparently anticipated

an appeal and was more concerned with the requisite notice rather than defendant's and his counsel's grounds for new trial. Given this context coupled with the absence of any discernable advantage from failing to specify grounds for a new trial, the district court cannot be reversed for deciding that defendant's procedural default was not a deliberate bypass barring habeas corpus review under *Fay v. Noia.*

The result is the same even if defendant's motion for new trial is reviewed under the cause and prejudice standard in *Wainwright v. Sykes.* Prejudice is plain. No witness who testified at trial saw the killing. The case turned on the credibility of defendant's testimony that he acted in self-defense. The prosecutor's questions during cross-examination suggested that another eyewitness told a story contrary to the defendant's. The suggestion was all the more damaging because the prosecutor's "source" was the defendant's own son. The district court's ruling that the defendant suffered ineradicable prejudice is consistent with *Madison v. State,* 55 Ala.App. 634, 318 So.2d 329, *cert. denied,* 294 Ala. 764, 318 So.2d 337 (1975).

Whether there was adequate cause for the failure to elaborate on defendant's motion for new trial turns on whether a finding of cause safeguards against a "miscarriage of justice," *Wainwright v. Sykes,* 433 U.S. at 91, 97 S.Ct. 2497, and whether it can be presumed that no strategic advantage can be gained from failure to comply with the procedural rule. *Jiminez v. Estelle,* 557 F.2d 506, 511 (5th Cir. 1977). The failure of Harris and his counsel to comprehend the importance of the procedural requirements attending a motion for new trial under the facts of this case is adequate cause raising an issue of injustice without compromising the legitimacy of state procedure. *See Sincox v. United States,* 571 F.2d 876, 879–880 (5th Cir. 1978); *Rinehart v. Brewer,* 561 F.2d 126, 130 n.6 (8th Cir. 1977). The district court found the procedural default of the defendant and his attorney was not a tactical maneuver since neither apparently grasped the importance of specifying the grounds for a motion for new trial.

The state has failed to demonstrate on this appeal any error in the district court's issuance of a writ of habeas corpus.

AFFIRMED.

COLEMAN, Circuit Judge, dissenting:

Statistics recently released by the Department of Health, Education and Welfare show that 0.6% of the deaths in the United States in 1940 resulted from murder. By 1968 the rate stood at 0.7%, an increase of only 0.1% in twenty eight years. In 1978 the rate stood at 1.1%, an increase of more than 50% in a decade. In what is assumed to be a more enlightened time, in a better educated populace, a citizen has nearly twice the chance of having his life stolen by murder than he had nearly forty years ago. According to the Associated Press Report 143 persons were murdered in Atlanta in 1978 and there have been 195 up to October 20 in 1979.

While individuals may differ as to the cause of this intolerable increase in the incidence of murder, the most reprehensible of crimes, the difficulties encountered in securing a conviction and preserving it against collateral attack in the federal courts is bound to be a part of the picture. The Constitution must be observed but it contains no mandate that it be stretched for the relief of clearly guilty criminals. The federal courts have gone from "per se" to "per se" to such an extent that those who have no respect for either the law or the Constitution are encouraged to believe that the state courts are now impotent to deal out punishment for crime.

The Supreme Court struck a blow at this turn of events when it recognized the harmless error rule in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

In the present case, the Magistrate recommended as follows:

> The Magistrate has made a careful detailed study of Harris' state trial transcript, including all of the testimony against him, and his own testimony on direct and cross-examination. Upon this,

it is concluded that the error Harris complains of was harmless beyond a reasonable doubt and contributed nothing to his conviction.

The District Court disagreed and invalidated the conviction, which prompted this appeal by the State. Based on my appraisal of the record, I agree with the Magistrate.

The majority, for whom I have the greatest possible deference and esteem, predicates affirmance on language lifted from *Madison v. State*, 55 Ala.App. 634, 318 So.2d 329, 336 (1975). Respectfully, I must point out that *Madison* was expressly decided on its own particular facts and it involved quite a different controlling issue of law. Moreover, in the language quoted by the majority the Alabama Court stated that the improper statements of prosecutors are reversible "where their impact upon the jury would be prejudicial" or "where its natural tendency is to influence the finding of the jury". Additionally, the statements in *Madison* were objected to, whereas in the instant case no objection was made.

I would hold that the statements in Harris' case, unobjected to, were neither prejudicial nor did they have a tendency to influence the finding of the jury.

The facts of the present case were set forth by the Alabama Court of Appeals, as follows:

The shooting occurred on may 26, 1976, on the front porch of the appellant's house located in the Mobile Heights section of the City of Montgomery.

While the appellant has raised the question of the sufficiency of the evidence, there is no need to recite, in minute detail, the testimony presented by each witness.

On the evening of the shooting, Mrs. Valerie Sawyer and Aaron Washington, the brother of the soon to be deceased Harold Wayne Washington, were sitting in Aaron's car listening to music. They were parked in front of the appellant's house. The deceased was next door talking to Mr. T. C. Thomas and his son.

Mrs. Sawyer, who was separated, was "going with" Joel Welch who was the appellant's half-brother. On one or two occasions prior to this night, Mrs. Sawyer had contacted the appellant about getting a message to Joel that she wanted to see him. Joel was married but he and his wife were "getting along bad". On this particular night, Mrs. Sawyer asked Aaron Washington to go get the appellant. Mrs. Sawyer wanted to see the appellant and not Joel. However, Aaron did not go.

Aaron's brother, the deceased, walked over to Aaron's car and Aaron asked him to go get the appellant for Mrs. Sawyer.

The appellant, his wife, his aunt, and his children were preparing for supper when the appellant heard a "loud", an "abrupt" knocking on his front door. When he opened the door, the deceased told him that "there is a girl wants to see you out here". The appellant told the deceased that he didn't want "nothing to do with all that, . . . I have got my wife and family here and I ain't got time for none of that. . . ." The appellant then told the deceased to get off his porch but Harold Wayne did not leave.

The appellant testified that the deceased then said, "Nigger, shoot me," and he "kept going into his pants" where the appellant saw a black handle which he thought was a pistol. The appellant further testified that Harold Wayne kept "bubbling up and everything" and his eyes were "rolling and wandering". The appellant "didn't understand where he was coming from" and the deceased kept repeating "Nigger, shoot me", and would not leave.

The appellant went to the closet and got his .22 caliber pistol. When the deceased again put "his hand into his pants", the appellant "shot out like that and shut the door" behind him allegedly to keep the deceased from shooting into the house and hitting his wife or one of his children. The appellant testified that he did not intend to shoot the deceased, but fired just to scare him away and to keep him from shooting into the house. The deceased cried out that he had been shot, ran into the street, fell and died.

After firing one shot, the appellant testified that he called the police. "A lot of people" gathered outside and when the appellant heard them talking about "getting the gun", he turned the lights off in the house. Next, according to the appellant, Aaron Washington pulled up near his house and fired a shot which came through the kitchen window and lodged in the kitchen wall. The appellant responded by firing once out the living room window.

When the police arrived on the scene, they found a large crowd gathered three or four houses down from the scene of the shooting. The deceased was lying in the street. On order, the appellant emerged from his house. He was immediately handcuffed and placed in a patrol car. Before the patrol car left for the police station, the appellant was advised of his constitutional rights which were read to him from a standard *Miranda* rights form.

On the way to the station, no one interviewed or interrogated the appellant. En route the appellant voluntarily stated that the deceased "had threatened him and he had wanted to shoot to warn him to get him away from the door and that he had not intended to shoot the man; that if he had shot somebody, he did not intend to shoot him". The appellant, according to Montgomery City Police Officer Frank H. Eckerman, further volunteered the information that he was interested in getting rid of some of the drug addicts in the neighborhood. The appellant denied making this last statement and stated that he did tell Officer Eckerman that something was wrong with the eyes of the deceased.

Captain I. B. Moore, a detective for the Montgomery Police Department, found a .22 caliber pistol in the living room of the appellant's house. Captain Moore turned the pistol, along with four live rounds and two spent hulls, over to Detective Cody Wood. Detective Wood also examined the inside of the appellant's house and observed "a hole in the wall in the kitchen that appeared to be made by a bullet".

At the police station later that evening, Detective Wood interrogated the appellant after advising him of his constitutional rights. At that time the appellant freely and voluntarily gave a signed statement which was properly admitted into evidence by the trial judge.

The substance of that statement was that the appellant was sitting in the living room of his home when Wayne Washington knocked on the front door and told the appellant that Valerie Sawyer wanted to see him. The appellant told Washington to "go on with that. Get off my porch . . ., my wife is here and my children and I don't want nothing like that." Washington then said, "Nigger, shoot me", and reached into his pants or under his shirt. The appellant then stated that he:

" . . . stepped back and got my pistol from the closet and went back to the door. He reached again in his pants and said again, go on, Nigger and shoot me. I shot out the door once and quickly closed the wood door. I just wanted to scare him. I didn't even mean to hit him."

The appellant then stated that he turned out all the lights and looked out the front window. He saw Aaron Washington with a gun and shot one more time "in the ceiling or somewhere", "to scare them and let them know not to shoot in the house . . .". The appellant, in his statement said that he shot the deceased because he "thought he had a pistol when he said Nigger, shoot me, and reached in his pants". The appellant did not want to kill him and just "wanted to scare him or wound him". Further the appellant stated that his half-brother, Joel, had told him that Mrs. Sawyer liked him and wanted to go with him. The appellant felt like the Washington brothers were trying to tear up his home.

A state toxicologist, Dr. Richard Roper, performed a post-mortem examination upon the deceased. It was his opinion that death resulted from hemorrhage and

shock associated with a single gunshot wound from a .22 caliber long rifle bullet which lodged in the upper portion of the deceased's chest. Dr. Roper did not undertake to determine what type of weapon (pistol or rifle) had fired the fatal bullet recovered from the deceased's body but stated that it could have been a .22 caliber pistol.

I look first to the nature of the trial which spawned *Madison*:

The trial was peppered throughout with heated arguments between counsel; with admonitions from the trial judge to both counsels; by threats to hold counsel in contempt; and by an offer from an assistant district attorney to defense counsel to settle their argument outside with fisticuffs. Such was the atmosphere throughout much of the trial. Counsel for appellant made repeated objections on grounds that remarks of the prosecutors were improper, one such remark being made outside the hearing of the court reporter, but supposedly within the hearing of the jury. In essence, appellant contends that while the trial court sustained many of his objections and instructed the jury not to consider some of the statements made, nevertheless, remarks were made in the presence of the jury which were not capable of being eradicated from their minds.

This Court must, therefore, carefully review the conduct complained of in light of the authorities cited by both the appellant and appellee, balancing the presumptions in favor of the correctness of the verdict against the effect such conduct would have on appellant's receiving a fair trial.

To cap all this, as if that were not enough, the prosecutor as a part of his evidence in chief tried to use the testimony of a State Investigator, and his notes to boot, as to what he had been told by two children, ages four and five, about how the *Madison* homicide occurred. The trial court rejected this testimony out of hand because children of this age were incompetent to testify even if they had been in court, let alone hearsay.

Nevertheless, when the defendant took the stand in his own behalf the prosecutor attempted to use those very statements as a basis for cross-examination. An objection was promptly sustained and the jury was specifically instructed to disregard the questions.

The conviction was reversed:

We find this statement to go beyond all bounds of legitimate cross examinations, under the circumstances of this case. The District Attorney in his zeal to contradict the appellant's testimony, in effect himself testified as to the statement of appellant's son which had previously been denied admission into evidence. As previously discussed, any inference that a quarrel had taken place between appellant and his wife, or that he had threatened her in any way prior to the shooting, would be most critical to a jury in reaching a verdict of second degree murder as opposed to manslaughter. We, therefore, are of the opinion that under these particular circumstances, even the prompt and conscientious instructions of the trial court to the jury would be insufficient to eradicate the prejudicial effect of the statement from the minds of the jury. See *Renfroe v. State,* 49 Ala.App. 713, 275 So.2d 692.

It must further be observed that in *Madison,* the victim was the defendant's little daughter. Both he and his wife, who was seriously wounded at the same time, testified, without live contradiction, that the shooting was accidental.

What we have before us at this time is simply not a *Madison* case.

To begin with, there is not the slightest doubt that our habeas corpus appellee, Harris, *deliberately* shot in the deceased's direction, with such success that he killed him dead on the spot. *Deliberation* was the issue in *Madison* but legal excuse or justification was Harris' defense.

It made no difference whether Tracy, the ten year old son, was eating dinner or in the living room. What Tracy might have said

about two shots being fired was of no importance because the defendant admitted that he did fire two shots, "one out the door and one over Aaron's head".

What Tracy might have said about the deceased getting ready to leave the door when he was shot, and being told that if he did not leave the defendant was going to get his gun and start blowing, made no difference, either. The defendant did go get his pistol. The deceased was shot in the upper chest, not in the back or side as would have happened if he were in the act of leaving. Moreover, the shot had to have been fired at or near level to have taken effect in the chest instead of flying harmlessly over the visitor's head.

Of course, defense counsel knew that the prosecutor had not called Tracy to the stand during the presentation in chief. It was extremely unlikely that he would have been left off if he was willing to testify to anything of value to the State. If defense counsel had objected and the objection had been sustained, as surely it must have been, that would end the matter. By not objecting, this left the matter alive and allowed the opportunity in closing argument to tear the prosecution to shreds for talking about what Tracy said and then not producing him in rebuttal—a trick so unfair that it would have had a powerfully negative effect on the jury. We do not have the oral arguments before us and we do not know what happened but it does not take all that much experience in the trial of homicide cases to know what well could have happened. At least, it cannot be said *per se* that defense counsel did not know what he was doing when he left the matter available for further exploitation.

To sum up, the defendant had deliberately fired in the direction of the unarmed deceased and killed him at a time when he was on a peaceful, *although unwise,* mission. The defense had to be that Harris acted in lawful defense of himself or others then and there present. On this subject, the undisputed physical facts spoke for themselves. The questions, unobjected to,

should not be allowed collaterally to upset this conviction.

*Madison* was decided on its own facts, far different from those we have here, and fundamentally on a different legal issue.

I would not upset this conviction on the ground that the killer's federally guaranteed constitutional rights have been violated *to his prejudice.*

I respectfully dissent.