LEIGH M. CLARK, Retired Circuit Judge.
This appellant has assuredly had his “day in court,” the appellant having been indicted November 9, 1979, for murder in the first degree, found guilty thereof by a jury in May 1980, which fixed his punishment at imprisonment for life. He was duly adjudged guilty by the court and sentenced to imprisonment for life in accordance with the verdict of the jury.
A large part of the procedural history of the case is correctly stated in Cannon v. Berry, 727 F.2d 1020 (11th Cir., 1984), in the second and third paragraphs of the opinion therein as follows:
“In May of 1980, a Jefferson County, Alabama, jury convicted Cannon of first degree murder and sentenced him to life in prison. Cannon appealed and retained an attorney.1 Although Cannon’s retained attorney had not filed a brief,2 the appellate court nevertheless reviewed the trial record for errors3 and on October 28, 1980, affirmed Cannon’s conviction without an opinion. Thus, the appeal was decided without the benefit of briefing or oral argument from counsel. The appellate court denied Cannon’s January 20, 1981, petition for rehearing, on the ground that a party has no right to apply for a rehearing unless a brief was filed on the direct appeal.4 Cannon next sought a writ of error coram nobis from the Jefferson County Circuit Court. The circuit court denied the writ and the criminal appeals court affirmed. Cannon v. State, 416 So.2d 1097 (Ala.Cr.App. 1982).
“Cannon then petitioned the District Court for the Northern District of Alabama for habeas corpus relief under 28 U.S.C. § 2254 alleging a number of constitutional errors in the various state proceedings. The magistrate, without considering Cannon’s other claims, recommended that the court grant the writ because Cannon’s appellate counsel rendered ineffective assistance by his failure to file a brief on the direct appeal from the state court conviction. The district court agreed with his recommendation and filed the above-mentioned order, under which the State must afford Cannon either a new trial or an additional direct appeal.”
The opinion in the cited case of Cannon v. Berry concluded with an affirmance of the judgment of the District Court for the Northern District of Alabama.
We now insert the contents of footnotes 1, 2, 3, and 4 as indicated above in the quotation from the first two paragraphs of the opinion in Cannon v. Berry, supra:
*1353 “1. Cannon filed notice of appeal orally during the sentencing hearing. Shortly thereafter, he retained a new attorney, Mr. Sheffield, to represent him on the appeal. The Alabama Court of Criminal Appeals was aware that Cannon had retained an attorney to conduct the appeal. The court had appointed Sheffield to represent Cannon, but rescinded the appointment when it learned that Cannon retained Sheffield independently.
“2. Under the longstanding policy of Alabama, Cannon did not need to submit a brief to perfect his appeal. See Hymes v. State, 209 Ala. 91, 95 So. 383 (1923). It appears from the record that Sheffield did file a belated brief on the day the court of criminal appeals issued its decision. The State concedes that the court did not consider the brief in deciding the appeal.
“3. Code of Alabama, § 12-22-240 provides:
“In all cases appealable to the court of criminal appeals the court must consider all questions apparent on the record or reserved in the circuit court and must enter such judgment as the law demands.
“4. The court dismissed the request for rehearing citing only the authority of Ala.R.App.P. 40 (‘No party can, as a matter of right, apply for rehearing unless brief was filed with the clerk [on the direct appeal]’). The State does not argue that the untimely brief was considered on rehearing, or that the petition for rehearing was considered on the merits.”
In accordance with what was held in Cannon v. Berry, supra, this Court granted a motion filed on May 14, 1984, by the State of Alabama for reconsideration of the previous direct appeal by Cannon from the judgment of conviction and sentence for murder in the first degree, which had been previously affirmed without an opinion, and appointed an attorney to represent appellant who now represents appellant and has filed a brief in his behalf, which has been followed by a brief on behalf of appellee, to which a reply brief has been filed by appellant’s appointed attorney. Our duty now is to consider and determine the five issues presented by appellant. They are argued in the briefs of both parties. In doing so, we have as a source of study the complete record proper and the court reporter’s transcript of the proceedings, which was filed in this Court in 1980.
Before the issues presented by the brief of counsel for appellant are stated, it is appropriate, we think, to give at this time a resume of the evidence on the trial of the case pertinent to the issues presented.
The appellant arrived at Constantine’s Bar in the Travelodge Motel in Yestavia, Jefferson County, Alabama, at approximately 8:30 or 9:00 P.M. and while there on that occasion was served seven straight tequilas, one vodka and orange juice and two Budweiser beers. Soon after midnight, he took off a red pullover T-shirt, began waiving the shirt around like a cape and yelling, “Toro!”, apparently pretending as if he were a bullfighter and conducting himself in a boisterous manner. According to the testimony of defendant, he was partially disabled physically by reason of an accident that caused him to have a fracture of his leg and another accident that caused him to have only about forty percent use of his left arm; about 1:15 A.M. the deceased, Gary Clyde Warnken arrived at the bar, and an unfriendly verbal encounter promptly occurred between him and the defendant. The defendant’s testimony as to the brawl between him and Mr. Warnken was in part as follows:
“Q. When did you first notice him?
“A. When I heard him screaming at me and I looked up and he was pointing at me.
“Q. What did he say?
“A. You are the man, you son-of-a-bitch, and I don’t like you, you’re the man.
“Q. Screaming and wild-eyed?
“A. Screaming and screaming.
“Q. Had you ever seen him before?
“A. No, sir.

*1354 “A. I asked him what his problem was.
“Q. What did he say?
“A. He just said you are the man, you son-of-a-bitch, and I will kill you, I don’t like the man.
“Q. I mean, this happened right there in the bar, he said he was going to kill you in the bar?
“A. Sir, I’m not quoting him word for word, because I wasn’t thinking I would be up here on this stand repeating it, but in my best judgment, yes, sir, those were the words, something similar to that.
“Q. You are the man, you son-of-a-bitch, I don’t like you and I’m going to kill you, something to that effect?
“A. Yes, sir.
“Q. Pointing to you?
“A. Yes, sir.”
According to further testimony of the defendant, he went out into the parking lot in about fifteen minutes after he had had the conversation with Mr. Warnken, where his car was parked, and toward which Mr. Warnken had gone when he was escorted out of the lounge. Defendant’s testimony continued as follows:
“Q. When you came out that lounge door, what happened?
“A. Well, I looked to my right and saw a couple of men standing beside a car, but I just kept walking to the left.
“Q. Did you know any of those people?
“A. No, sir.
“Q. Had you ever seen either one of them before?
“A. Well, one of them was Gary Warnken, I wasn’t exactly sure, because I just saw the man briefly inside.
“Q. One of them was Gary Warnken?
“A. Yes, sir.

“Q. Now, what did Gary Warnken do as you came across here to your car?
“A. Well, as soon as I got off the side walk and started across, I heard that same sound, hey, you son-of-a-bitch, you are the man.

“Q. Did he catch up with you?
“A. He caught up with me at the back of my car. He was three or four feet from me at the back bumper of my car.
“Q. He got up and caught up to you at the rear corner of your car?
“A. Yes, sir.

“Q. Go ahead and tell me what was going on while you were crossing the parking lot.
“A. He first started screaming at me when I first came out and I turned around and told him I didn’t want any trouble. All I wanted to do was leave and go home. So I turned back around to walk to my car and I heard him come up again. This time, I turned around and started back toward my car and he quit screaming and started grinning, and the closer he got he would grin and say you son-of-a-bitch, and I am going to kill you, I am going to kill you. He — damn you. I said, friend, please just go on and leave me alone, I don’t want any trouble with you, and he grinned and said it over again.
“He said give me that money you son-of-a-bitch. I said, friend, I don’t have any money. And he kept saying give me the money.
“Q. You had some money on you, didn’t you?
“A. Yes, sir.
“Q. How much?
“A. Thirty-seven hundred dollars.

“Q. When he was screaming at you, coming down this way (indicating), what happened after you got to your car?
“A. I walked back alongside of the car and opened the car door.
“Q. Passenger’s side?
“A. Yes, sir, passenger’s side.
“Q. Okay.
“A. And I took the money out of my pocket and put it in my right hand and stuck it up under the seat of the car, and there was a .38 caliber pistol under the seat. He wasn’t grinning a smile grin, it was the toning grin; in other words, you *1355 son-of-a-bitch, I’m going to kill you. And I pulled the pistol out and held it down to my side, and I said, friend, just back off and let me go home, I don’t want no trouble, all I want to do is get in my car and leave. And by this time, he was up a couple of feet from me. Maybe eighteen inch, and again, I said, Buddy, just back off and let me go home, all I want to do is get in my car and leave. He said you try to get in that car you son-of-a-bitch and I am going to kill you. And I sort of made a right turn toward the car door and the man lunged at me with his left hand and I caught him in the right side of his shoulder because this arm was up-cocked and I caught him right here (indicating) and turned him sideways and in the same motion I came up with the gun and the gun discharged.
“Q. He was right on you when you shot him?
“A. He was right on me when he swung at me. When I hit him with my left hand I staggered him backwards, sideways, but it was all in the same motion, I mean, it was just like so.

“Q. You pushed him, you say he swung at you or grabbed at you?
“A. Grabbed at this shoulder (indicating), and I caught him here (indicating) with this hand and sort of turned him sideways and staggered him backwards, in the same motion, I was scared to death, I raised the gun and fired.
“Q. How far away was he from you when you fired?
“A. I have really no way of knowing, he could have been four foot, five foot, because I know I ducked back and pushed him back and it all happened in one motion.”
Mrs. Eva Bradley, who with her husband was a resident of a residential section of Vestavia Hills, the city in which the alleged crime occurred, testified that she had “an occasion on September the 2nd or early morning hours thereof,” to go to Constantine’s Lounge, knowing that her husband was there and to “bring him home.” After testifying as to where she parked the automobile she was driving, she testified as follows:
“Q. Now, tell us, please, ma’am, what, if anything did you observe as you walked from your car down here to the lounge door?
“A. Before I got up there to where that boat is — well, when I had first got out of my car, I always look around anyhow when it is early in the morning if I am out anywhere, and I happened to see two men talking. It appeared over across the parking area over here (indicating). At that time, there were cars parked over here on the other side too, right across from the sidewalk there.

“A. Uh-huh, right over there. There were two people talking, one, and I didn’t know them at the time. One was Rudy Cannon and the other one was Gary. They were talking over here on the side, and I didn’t pay a whole lot of attention when I got out of the car, but that is what I saw when I first got out, was them two talking.

“Q. Did you see any blows pass?
“A. No.
“Q. Now, tell us from that point what you observed as you continued to walk down the sidewalk?
“A. Well, as I walked down the sidewalk to go into the door there, I kind of looked up several times occasionally, because these two people were standing over there talking, and then I noticed Gary—
“Q. How was he dressed?
“A. He had on a white short-sleeved shirt and a pair of black trousers — I mean brown trousers, excuse me. And Rudy had on a red and white shirt. And as I was walking down the sidewalk, they were talking. It appeared that is what they were doing, and then all of a sudden, Gary, the one in the white shirt started backing up, just kind of backing up, and the first thing I knew, I glanced up again and Rudy from somewhere, I *1356 don’t know where he brought it from, but he had a gun in his hand and he raised it and he aimed it at Gary and he shot him.
“Q. What was Gary Warnken doing, the person in the white that you came to know as Gary later, what was he doing when Rudy Cannon shot him?
“A. He was just standing there looking at him backing up and when Rudy shot him with the gun he clutched his shirt front like this (indicating)—
“Q. Who clutched their shirt front?
“A. Gary did, clutched his shirt front when Rudy shot him and said, Oh, my God, he has shot me. He grabbed his shirt front like this (indicating) and started staggering backwards.”
Dr. Ronald L. Rivers, then employed by the Jefferson County Coroner’s Office, testified that he performed an autopsy on the body of Gary Warnken about 9:00 A.M. In describing the path of the bullet, Dr. Rivers testified:
“The path of the bullet was into the sternum or the breast-bone at the level of the fourth rib and actually fractured the breast plate and then entered the mediastinum or the middle of the tissues overlying the heart, and the bullet perforated the heart, and then it perforated the middle and lower lobe of the right lung. It then exited the chest cavity at the sixth intercostal space, that is the space between the sixth and the seventh ribs, and it actually fractured the seventh rib. And then it fractured the right scapula or the shoulder blade on the right at the apex at the very tip of the shoulder blade is fractured, and at that point, a partially deformed large caliber concave based lead slug was recovered.”
I.
By the first issue presented in appellant’s brief, his counsel urges that the trial court committed reversible error “when it refused to exclude from the evidence clothing taken from the appellant while he was in custody for use against him without apprising him of his Constitutional rights prior thereto.” He quotes the following portion of the transcript of the testimony of Detective Doug Jefferson of the Yestavia Police Department on cross-examination by defendant’s attorney:
“Q. Sgt. Jefferson, did you ask Mr. Cannon whether or not you could take his clothes off of him?
“A. Yes, sir.
“Q. Well, I understand that, but you didn’t ask him if you could have his clothes to keep, did you?
“A. I told him we needed his clothes for evidence.
“Q. You didn’t get him to sign an agreement to get him to get his clothes off, did you?
“A. No, sir.
“Q. You didn’t ask him if you could take them, did you?
“A. No, sir.
“Q. You told him you needed them, didn’t you?
“A. Yes, sir.
“Q. As a matter of fact, you put him in some kind of jail clothes, didn’t you?
“A. Yes, sir.
“Q. Where do you get the jail clothes from?
“A. Jefferson County Jail.
“Q. Had you ever done that before?
“A. I never had the occasion to.
“Q. I understand you might not have ever had the occasion to, but my question was, have you ever done that before?
“A. No, sir.”
In appellant’s brief, his attorney divides this issue into two parts, (A) and (B). In (A), appellant’s attorney in his brief “recognizes that under the law in Alabama a failure to inform the accused of his right to refuse to release his clothing cannot provide the single basis for determining whether he voluntarily consented to release his clothing to the authorities” and that a “totality of circumstances” approach must be taken. He further argues that measured by the principle of “totality of circumstances” the State did not meet the burden upon it to show that defendant vol *1357 untarily gave his consent to the taking of his clothes. We agree with appellant’s attorney that defendant on the trial was harmed by the evidence of the experts who examined the clothing concerned, particularly one of them who testified that he found “in the knife, [a knife that was found near the body of deceased soon after he was shot] fibers which were of the same microscopic characteristics as these that were found in the left front pocket” of the trousers of defendant, but that he did not find such fibers taken from the pockets of the trousers of the deceased. However, we do not agree with appellant’s contention that the State did not meet “the burden of proving” that defendant’s “consent was freely and voluntarily given” for his trousers to be taken from him and examined.
As to appellant’s issue 1(B), appellant urges “The Seizure of Appellant’s Clothing While He Was in Custody Constituted a Violation of His Right Against Self-incrimination.” He cites as the only case that bears any semblance of any support, Anthony v. State, 30 Ala.App. 425, 7 So.2d 513 (1942), wherein at 7 So.2d 516, the following statement is found:
“State witness, Virgil Sandefer, a City detective, testified, over the objection and exception of defendant, that he, with others, went to the city jail, where Sam Anthony was confined as a prisoner and took his (Anthony’s) shoes off of him and carried them away to the scene of the alleged crime, for the purpose of comparing the shoes with certain tracks. This act of this witness was unlawful, under the law he had no right to take defendant’s shoes off of his feet and carry them away for the purpose stated. Davis v. State, 131 Ala. 10, 16, 31 So. 569; Cooper v. State, 86 Ala. 610, 6 So. 110, 4 L.R.A. 766, 11 Am.St.Rep. 84. In the Davis case, supra, the Supreme Court said: ‘this testimony was clearly illegal under the principle that the accused cannot be compelled to do or say anything that may tend to incriminate him....’ [131 Ala. 10, 31 So. 571], The principle above declared is founded upon the protection guaranteed to him by the Constitution that ‘he shall not be compelled to give evidence against himself.’ Art. 1, § 6, Const. 1901.”
Anthony v. State is distinguishable in two respects particularly. In the first respect, in Anthony there was not even any claim that Anthony had consented to the seizure of his shoes, while in the case sub judice, there was substantial evidence of consent by defendant. In the second respect, this case is distinguishable from the other in that the taking of the clothes of defendant occurred while authorities at the jail were in the normal process of having defendant change his clothes from the clothes he was wearing when taken to jail to clothes provided for prisoners in the jail according to the customary jail procedure.
In addition to what we have stated as to this issue, we note that what we now hold as to it is in accord with what was stated by the late Judge Barron on the appeal from the judgment denying this appellant’s coram nobis petition in Cannon v. State, Ala.Cr.App., 416 So.2d 1097, 1100 (1982):
“The issue of an alleged illegal search and seizure is not within the scope of coram nobis. Goodman, supra, and Summers, supra. In passing, it is noted that appellant’s contentions in this regard are not borne out by the records of either the trial proper or the coram nobis hearing. [Emphasis supplied].”
Before disposing of appellant’s Issue I, we also note that the parties are in disagreement on appeal as to the effect of the failure of defendant to object to the evidence as to the taking of the clothing of defendant. In the brief of counsel for appellant, it is stated in the last sentence thereof, “Appellant submits that whether there may have been a timely objection or not, appellant was denied due process of law and reversal is nevertheless mandated.” In the concluding three sentences in the brief of counsel for appellee as to the particular issue, we find:
“Reversible error was not committed. Furthermore, there was no objection *1358 made by the defense when the State offered State's Exhibit 19-B [the mentioned pair of pants of defendant]. See page 442 of the transcript.”
We agree with appellee.
We conclude our consideration of Issue I by stating that neither by Issue 1(A) nor by Issue 1(B) does appellant succeed in showing that the trial court committed error prejudicial to defendant.
II.
We now quote the caption and the first paragraph of the argument in support of this issue as found in appellant’s brief:
“THE JURY VERDICT AND JUDGMENT ARE INSUFFICIENT TO SUSTAIN A CONVICTION FOR MURDER “Appellant contends that the jury verdict and judgment of the Court is insufficient to sustain a conviction of murder in that the testimony of the State given by Dr. Ronald L. Rivers and Eva Bradley is irreconcilable. Dr. Rivers testified that he examined the body of the deceased and that it was physically impossible for the arms of the deceased to be at his side when the shot was fired, based on the path of the bullet. Ms. Bradley, the only eyewitness to the incident testified that the deceased’s hands were at his side when the shot was fired. In Parker v. State, 280 Ala. 685, 19 [198] So.2d 261 (1967), the Alabama Supreme Court held that where testimony is inherently and physically impossible because of irreconcilability with physical facts and common observation, such testimony is to be disregarded as being without probative value even though uncontradicted.”
From the testimony of Dr. Rivers, appellant succeeded in showing some apparent conflict between the testimony of Dr. Rivers and the witness Eva Bradley, but he does not show any irreconcilable conflict between the testimony of said witnesses, for that the expert testimony of Dr. Rivers to the effect that the hands of the deceased were not at his side at the exact moment the bullet entered his body while the testimony of the lay witness Ms. Bradley as to where the hands of the deceased were is not necessarily as to the precise moment the bullet entered the body of deceased. Furthermore, the testimony of neither witness, when considered separately or with, that of other witness, is “inherently and physically impossible because of irreconcilability with physical facts and common observation” which distinguishes this case from that of Parker v. State, supra, cited by appellant.
III.
Appellant’s third contention for a reversal is that the trial court “erred in failing to order that the appellant be credited with all time served pending trial and sentencing.” Appellant relies upon Code of Alabama 1975, § 15-18-5, which provides:
“Upon conviction and imprisonment for any felony or misdemeanor, the sentencing court shall order that the convicted person be credited with all of his actual time spent incarcerated pending trial for such offense. The actual time spent incarcerated pending trial shall be credited by the circuit clerk or district clerk on forms to be prescribed by the Board of Corrections.”
The appellee refutes this contention of appellant by calling our attention to the following paragraph contained in the judgment entry, on page 566 of the record proper:
“It is hereby Ordered that the defendant be credited with all of his actual time spent incarcerated in the Jefferson County Jail pending trial of this cause unless he was serving time for another offense.”
IV.
By the fourth issue presented by appellant as quoted hereinabove, appellant directs attention to the rulings made during the arguments of counsel for the parties to the jury, as shown by the court reporter’s transcript as follows:
“MR. WAITES [Defendant’s attorney]: Please, Mr. Cannon there did not know *1359 the deceased. So we are precluded from any mention of the deceased’s reputation and character, his personality, we can’t do that. So, we can’t delve into that—
“MR. BARBER [Assistant D.A.]: Your Honor, I am going to object to that, that is not a correct statement of the law.
“THE COURT: Sustain the objection. Let’s proceed.

“MR. BARBER: Mr. Waites stood up here and told you they couldn’t put on testimony about the deceased’s bad character. They can put on testimony about the deceased’s bad character about him being a violent person—
“MR. WAITES: Oh, no, sir, Judge, he objected to that and he knows—
“THE COURT: If you gentlemen have a remark to address to me and I will rule upon the objection.
Mr. Waites, do you object?
“MR. WAITES: Yes, sir.
“THE COURT: Overrule.
“MR. WAITES: We except.
We agree with appellant’s argument to the effect that there was some evidence, presented chiefly by the testimony of the defendant, that defendant was acting in self-defense when the alleged victim was killed by a bullet from a pistol in the hand of defendant and that any evidence of the victim’s “bad general reputation for peace and quiet, violence or the like trait” was admissible, as was held in Laffity v. State, Ala.Cr.App., 423 So.2d 280 282-83, cert. denied, Ala. (1982). Our reading of the transcript leads us to believe that there was not a complete meeting of the minds of counsel for defendant, counsel for the State, and the trial judge as to either the objection made by State’s counsel to the argument of defendant’s counsel, or the objection of defendant’s counsel to the argument of State’s counsel, but we are not convinced that any prejudicial error was committed by the trial court in either of its rulings on the subject adverse to defendant. As stated by Judge Tyson in Taylor v. State, Ala.Cr.App., 408 So.2d 551, 553, writ denied, Ala., 408 So.2d 555 (1981):
“We are also reminded that the propriety of arguments of counsel is largely within the discretion of the trial court because the trial court is best able to assess the issues, parties, and circumstances of each case and determine the potential prejudicial impact of the improper argument on the jury. Garrett v. State, 268 Ala. 299, 105 So.2d 541 (1958); Madison v. State, 55 Ala.App. 634, 318 So.2d 329, cert. denied, 294 Ala. 764, 318 So.2d 337 (1975); Simpson v. State, supra, [354 So.2d 317 (Ala.Cr.App.1977), cert. denied, 354 So.2d 324 (Ala.1978).]”
V.
The final issue presented in appellant’s brief is captioned as follows:
“THE TRIAL COURT ERRED TO REVERSAL WHEN IT REFUSED TO GIVE APPELLANT’S REQUESTED CHARGE NO. 45 REQUESTING AN INSTRUCTION ON REASONABLE DOUBT AND UNCERTAINTY BY THE EVIDENCE OR ANY PART OF THE EVIDENCE.”
Defendant’s Charge No. 45 was as follows:
“If, upon a consideration of all the evidence, the minds of the jury or any member of the jury, is left with a state of reasonable doubt and uncertainty, by the evidence or any part of the evidence, of the defendant’s guilt, then you cannot convict the defendant.”
Neither party on appeal fully convinces us as to the correctness of his or its position as to this issue. During the oral charge of the court, it dealt lengthily and almost exhaustively as to the burden of proof upon the State to prove by the evidence beyond a reasonable doubt and to a moral certainty the guilt of the defendant, and as to the necessity for a unanimous verdict before any verdict of guilty could be legally rendered by the jury. Among the instructions given in the oral charge of the court were the following:
“I instruct you that this reasonable doubt may arise from the evidence or *1360 from the lack of evidence or from both, keeping in mind always the presumption of innocence that attends the defendant throughout the trial.

“If after considering the evidence as to self-defense together with the whole evidence there has been generated in your mind a reasonable doubt of the defendant’s guilt because of all the evidence in' the case of self-defense and the other evidence, it will be your duty to acquit the defendant and to find the defendant not guilty.

“Good character, if proven by the defendant, and taken in connection with all the other evidence, may generate a reasonable doubt which would entitle the defendant to an acquittal, even though without such proof the jury would convict.”
Although the precise language of defendant’s requested written Charge 45 is difficult, if not impossible, to find in the court’s oral charge, we are convinced that it was substantially covered by portions of the court’s oral charge. We are also convinced by the transcript of the evidence that it was overwhelmingly to the effect that defendant was guilty of either murder in the first degree or some lesser included offense of unlawful homicide, that defendant was not prejudiced by the refusal of the trial court to give defendant’s requested written Charge No. 45.
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.