164 So. 309

## DREDD v. STATE.
### 3 Div. 775.

Court of Appeals of Alabama.
Nov. 19, 1935.

A. A. Carmichael, Atty. Gen., for the State.

SAMFORD, Judge.

The defendant, who was forty-five years of age and a man of good character in the community where he had lived for eighteen years, was a watchman at the filling station of and employed by Fred Thigpen. Early Cook, the dead man, had, with others, on Wednesday night before the homicide committed a burglary on the residence of Fred Thigpen and stolen from the house some several hundred dollars worth of personal property. On being surprised in the house by Thigpen, several burglars who were in the house ran over him and made their escape, and, as they were running away, one of them fired a gun or pistol at Thigpen. On Saturday night Thigpen and others with him apprehended Early Cook and arrested him. After being arrested, Cook told Thigpen who his confederates were and where he would find the stolen goods. Thigpen took Cook to the filling station and left him in the custody of this defendant, telling defendant that Cook was one of the ones who had burglarized his house. Thigpen told defendant to get his gun and guard Cook until he, Thigpen, got back. Thigpen then left to arrest Arthur Ferguson, another of the burglars. Shortly after being left in the custody of defendant, Cook attempted to escape. He grabbed an automobile crank, struck defendant in the head with it, and fled. Defendant fired one shot from a double-barrel gun striking Cook in the back of the right leg causing a wound from which about sixty hours afterwards Cook died.

There were many questions asked to which there were timely objections and

Powell & Hamilton, of Greenville, for appellant.

exceptions of defendant as to what was done by other parties after the killing and with which this defendant was in no way connected. This was no part of the res gestæ and defendant's case should not have been burdened with questions to his witnesses, clearly illegal and tending to prejudice the jury as to the testimony being given. All of these questions were propounded to Thigpen, defendant's employer, and Mr. Moore, the chief of police of Georgiana, who were testifying on behalf of defendant. True, these questions were all answered in the negative, but the persistent asking of such illegal questions constitutes insinuations prejudicial to defendant, which the court ought not and will not countenance. In this connection we adopt as our own the following from People v. Grider, 13 Cal.App. 703, 110 P. 586, 590: "Where, an improper question is asked of a witness by a district attorney, the test whether it is misconduct is found in answer to the question: 'What was the purpose of counsel in asking the question?' If it was to take an unfair advantage of the defendant by intimating to the jury something that was either not true or not capable of being proven in the manner attempted, then it is error. And, if the district attorney knows when he asks the question that an objection to the question should or will be sustained, the error is not corrected because the objection is sustained. Where the prosecuting attorney asks a defendant questions which he knows to be wholly wrong, and where the questions are asked without expectation of answers, or where they are asked and withdrawn upon objection, and the clear purpose is to prejudice the jury against the defendant in a vital matter, by the mere asking of the questions, then a judgment against the defendant will be reversed, although objections to the questions were sustained, unless it appears that the questions could not have influenced the verdict."

To the same effect are the decisions of this court and of the Supreme Court. Windom v. State, 18 Ala.App. 430, 93 So. 79; Ex parte Windom, 208 Ala. 701, 93 So. 924; Williams v. State, ante, p. 53, 152 So. 264; Bozeman v. State, 25 Ala. App. 281, 145 So. 165.

 The defendant offered to prove the bad character of deceased for being a dangerous, bloodthirsty, and turbulent man. This the court denied and defendant duly excepted to the ruling. The general rule is, as to admission of the bad character of deceased in a homicide case, that such evidence is not admissible, unless there is some evidence to sustain a plea of self-defense; this upon the broad principle that a defendant has no right to kill a man simply because he was a bad character. But, there is another rule equally well grounded in common sense and reason. Where an officer (as in this case a citizen) has in his custody a prisoner who is guilty of a felony and the felon attempts to flee, he may use such force in preventing the escape as is necessary, or as appears to him in the exercise of reasonable discretion to be necessary, even to the extent of taking life. In such a case he is not limited to the force necessary to protect himself from death or great bodily harm. 30 Corpus Juris 40 (195)b. On this question and especially as to the reasonableness of his action, the character of the felon would have weighty bearing, not that it furnishes any excuse for aggressive action, but because more prompt and decisive measures are justified when the felon is of known violent, bloodthirsty, desperate, or dangerous character. We have no direct authority on this, but we are persuaded that a person having the custody of John Dillinger would be warranted in acting more quickly than if the person in custody was a man of peace and quiet and not dangerous. There are decisions to be found which, while not on all fours, are persuasive to the above conclusion; such are DeArman v. State, 71 Ala. 351; Lambert v. State, 205 Ala. 547, 88 So. 847; State v. Dumphey, 4 Minn. 438 (Gil. 340).

We have read the evidence in this case sitting en banc and are clearly of the opinion that the conviction was wrong and should not be allowed to stand. The defendant was acting the part of a good citizen in guarding a felon, while others rounded up other parties guilty of the same heinous crime with which deceased was charged and which was admitted by him. Until courts and the public at large learn that maudlin sentiment and sympathy for criminals has no place in our courts or the administration of justice, we may expect the carnival of crime to continue in our midst and to increase in proportion to the leniency with which the criminal is treated both in the minds of

the public and in the enforcement of punishment.

The judgment is reversed and the cause is remanded.

Reversed and remanded.

A. A. Carmichael, Atty. Gen., for the State.