[No. 36340.   Department Two.   December 27, 1962.]

THE STATE OF WASHINGTON, *Respondent*, v. THOMAS DOWNEM CLARKE, *Appellant*.*

*Greenwood & Shiers,* by *Ray R. Greenwood,* for appellant.

*Gordon L. Walgren* and *Jack A. Richey,* for respondent.

DONWORTH, J.—This is an appeal from a judgment and sentence based upon a conviction of the crime of manslaughter. Appellant was charged with murder in the second degree.  At the trial, the court instructed the jury on the issue whether or not appellant was guilty of the included lesser offense of manslaughter.

There is no substantial dispute regarding the material facts involved, which may be briefly stated as follows:

Appellant was the owner and operator of a tavern in Kingston, Kitsap County.  On the evening of September 2, 1961, the deceased, a sailor in uniform, and his older male companion, traveling in an automobile, stopped near the tavern.  They parked the car and each entered the tavern, although not simultaneously.  The deceased ordered a beer, and, while seated at the bar, became involved in an argument with Gil Lund.  Lund forcibly ejected the deceased out the door, where he hit or slapped him.  Lund's brother,

*Reported in 377 P. (2d) 449.

Arnold, forcibly ejected appellant's companion from the tavern, saying to both of them, "We don't like queers." The two Lunds then re-entered the tavern for a few minutes. The deceased became very angry, and the Lunds again went outside. He then pulled a knife and cut Arnold Lund on the arm, making two deep gashes, which required 28 stitches to close.

Appellant then told another man, who was inside the tavern, to call an ambulance and the sheriff (which was done). He then took his rifle from behind the bar and ran out to the car in which he found the decedent and his companion seated.

Appellant pointed his gun at the two men, and told them to stay where they were, and that he had called the law. The decedent then broke out of the car and ran down a side street. Appellant called to him to stop but he kept running. Appellant fired three shots at him. The third shot hit the decedent in the head, killing him almost instantly.

One of the state's witnesses, a staff sergeant in the army, testified, on cross-examination, regarding what took place after Gil Lund had slapped the deceased and had come back into the tavern, as follows:

"Q. And then Mr. Clarke went out where the two Lunds were? A. Right. Q. That was before the stabbing, wasn't it? A. I believe it was. I think it happened about that time. Q. And at that time Mr. Clarke was unarmed? A. Yes. Q. And then whether or not you saw the three of them hastily retreat back in, the two Lunds and Mr. Clarke? A. Yes. They all came back in the door pretty fast. Q. Do you know why? A. Well, the next thing I saw in the door after they got back in and this guy slammed the door was the sailor was standing there with his knife. Q. He was standing there with his knife? A. Yes. Q. And did you hear him say anything? A. He says, 'Come on out. I'll kill all you sons of bitches,' or something. Q. He was going to 'kill all you sons of bitches'? A. Yes. Q. And was it then that you first noticed that Arnold Lund had been cut? A. Yes. I saw his shoulder when he came through the door. Blood was . . . Q. Now, that was all right in your presence and in the presence of Mr. Clarke and everybody and the Lunds. Is that right? A. Yes. Q. And then was it then that Mr. Clarke went back to the rear and took

his rifle and went out? A. Yes. Q. You saw that after these men had retreated in and the sailor had made this threat to kill every s.o.b. in the place? Then you saw him run toward the car? A. Well, I wouldn't say he ran but he did turn around and start back that way. Q. Yes. It was then that Mr. Clarke went out and you followed him? A. Yes. Q. And Mr. Clarke said, did you hear Mr. Clarke instruct Mr. Kleiven, the man you say that was sitting near the door, to call the sheriff? A. Yes. Q. You heard that? A. Yes. Q. Told him to call the sheriff and the ambulance, did he not? A. Yes. Q. And then when he got outside he pointed this gun at the windshield of this car. Is that right? A. Right. Q. Now, how far away was he when he did that from the car, about? A. Oh, about three foot in front of the car, three full feet or something. Q. And what did he say to them exactly? A. As best as I can remember is he said, 'Stay put until the law gets here' or 'until the sheriff gets here' or something like that. Q. Did he say he had called the sheriff, or 'Stay there until the sheriff gets here,' some words meaning exactly that. Is that it? A. Yes. Q. And then after the sailor broke and ran down the street, you say you heard Mr. Clarke say, 'Stop or I'll shoot'? He said something like that, yes. Q. You are clear that he said words to that effect. Is that right? A. Yes. Q. Not being able to remember the exact words? A. Yes. Q. But he did tell him and warned him. And was that said in tones loud enough to be heard? A. Yes, it was. Q. He called it to him? A. Yes, sir."

At the trial for second-degree murder, appellant testified that he had intended only to hit the decedent in the legs. The jury apparently believed him because, under instructions which gave them no choice but to find appellant guilty of either second-degree murder or manslaughter (or not guilty of either), they found him guilty of manslaughter, a crime in which the killing is unintentional.

RCW 9.48.060 provides:

"In any case other than those specified in RCW 9.48.030 [first degree murder], 9.48.040 [second degree murder] and 9.48.050 [duelling], homicide, not being excusable or justifiable, is manslaughter."

The sections cited define murder in the first and second degrees, and penalize duelling. An intentional homicide

is at least second-degree murder unless justifiable or excusable.

Appellant assigns as error the giving of four instructions (Nos. 4, 6, 7 and 13). No. 4 and No. 6 submitted to the jury the issue of manslaughter as an included lesser offense. We find no error in the giving of these two instructions. However, in No. 7, the trial court, after correctly defining excusable and justifiable homicide, concluded the instruction as follows:

"You are further instructed that there is no evidence introduced in this case under which a finding could be made by the jury that the killing was either excusable or justifiable."

For reasons stated below, we think that it was reversible error to tell the jury that there was no evidence in the case under which it could find that the killing was excusable.

Likewise, instruction No. 13 was erroneous because, after quoting the provisions of RCW 9.11.040 relative to the use of force by a citizen in arresting a felon, the court told the jury that "such force shall, however, not include killing."

We now turn to a discussion of the reasons for our holding instructions No. 7 and No. 13 to be erroneous.

The issue in this case is: Was the trial court in error in instructing, as a matter of law, that the homicide was not excusable? The answer to that question will be found when we find what degree of force may lawfully be used by a citizen in attempting to apprehend a fleeing felon.

RCW 9.48.150 provides:

"Homicide is excusable when committed by accident or misfortune in doing any lawful act by lawful means, with ordinary caution and without any unlawful intent."

In returning its verdict of guilty of manslaughter, the jury must have found that the homicide in this case was accidental (*i.e.* unintentional) within the meaning of this section. If the act of trying to apprehend a fleeing felon was lawful, it was for the jury to determine whether ordinary caution was used, provided that there was sufficient evidence on that point. In the absence of any evidence on

that point, doubt must, as usual, be resolved in favor of the accused.

Appellant testified that he had intended to hit the decedent in the legs. There was also testimony corroborating his testimony that he had told the decedent and his companion, while they were seated in the car, that the sheriff had been called and that they should stay where they were. Also, there was corroboration of appellant's testimony that, when the decedent had started to flee, appellant had shouted to him to halt or he would shoot. The remaining question, upon which the outcome of this appeal depends, is whether appellant used lawful "means" in his attempt to apprehend a fleeing felon.

By firing a gun three times in the direction of the fleeing decedent, appellant made use of deadly force, *i.e.* force which is capable of, and entails great risk of, killing.

This court must decide whether it can be lawful in the state of Washington for a private citizen, in making an arrest for a felony, to use deadly force in attempting to apprehend a fleeing felon.

On this precise question, the legislature has not spoken. RCW 9.11.040 (which is found in the chapter on assault) provides that the use of force shall not be unlawful

"(2) whenever necessarily used by a person arresting one who has committed a felony and delivering him to a public officer competent to receive him into custody."

It can be argued that the term "necessarily," as used in the above-quoted portion of the statute, refers to that force which is necessary to overcome *resistance,* rather than to the force used in apprehending a felon who is fleeing from arrest. It is also arguable that the sole purpose of the section is to provide a defense against a charge of assault, and not a defense against a homicide charge. There is, ultimately, a serious question whether "force," the use of which is made lawful by RCW 9.11.040(2), includes deadly force. We have discovered no case which has considered these questions.

We can, however, draw at least two conclusions from RCW 9.11.040: First, the type or amount of force is not

expressly limited, nor is the use of deadly force expressly prohibited, so there is no notice to the public that they cannot use deadly force in attempting to apprehend a fleeing felon. Second, the legislature has expressed its approval of spontaneous effort on the part of private citizens in attempting to arrest persons who have committed felonies.

Nevertheless, since the applicability of RCW 9.11.040 (2) to the problem before the court is debatable, we must conclude that the term "lawful means" in RCW 9.48.150 cannot be interpreted by reference to statutes alone.

█ The majority of the jurisdictions which have considered the question have apparently adopted the common-law rule that a private citizen has the same right to use deadly force as a peace officer would have in apprehending a felon in the same situation. See *Crawford v. Commonwealth,* 241 Ky. 391, 44 S. W. (2d) 286 (1931); *Dredd v. State,* 26 Ala. App. 594, 164 So. 309 (1935); *Scarbrough v. State,* 168 Tenn. 106, 76 S. W. (2d) 106 (1934); *Commonwealth v. Micuso,* 273 Pa. 474, 117 Atl. 211 (1922); *Brooks v. Commonwealth,* 61 Pa. 352, 100 Am. Dec. 645 (1869). See, generally, 3 C.J.S., Arrest § 13, and 40 C.J.S., Homicide § 102; 26 Am. Jur., Homicide § 102 and § 232; Warren on Homicide, §§ 142-145; Bishop on Criminal Law (9th ed.), § 646; and Bishop's New Criminal Procedure (2d ed.), §§ 164-172.

Although *Crawford v. Commonwealth, supra,* based its decision on a statute authorizing a private person to make an arrest, it relied on the common law to determine the degree of force that could be used. The authorities are in agreement that an officer or a private person can use only such force as appeared to him, in the exercise of reasonable discretion, to be necessary to effect the arrest or prevent an escape from custody.

The Model Penal Code, on the other hand, does not allow the use of deadly force even when it is "immediately necessary to effect a lawful arrest," unless "the person effecting the arrest is authorized to act as a peace officer." American

Law Institute, Model Penal Code, § 3.07 (2) (b) (adopted May 24, 1962).[1]

We conclude, after careful consideration of the conflicting arguments, that the best rule, and the rule which we adopt in this case, is that it is lawful for a private citizen to use deadly force in attempting to apprehend a fleeing felon in any situation where it would be lawful for a peace officer to do so.

The above rule is limited, of course, to the type of situation before us, where the homicide itself was unintentional. The "justification statute," RCW 9.48.160, which is not restricted to *unintentional* killings, says:

"Homicide is justifiable when committed by a public officer, or person acting under his command and in his aid, in the following cases: . . . in arresting a person who has committed a felony and is fleeing from justice; . . ."

Since RCW 9.48.160 is limited to peace officers, or persons acting under their command and in their aid, the implication is that private citizens, acting on their own responsibility, cannot lawfully commit an *intentional* homicide under the same circumstances. That is not the case before us.

However, to say that the "excuse statute" (RCW 9.48.150) applies to private citizens as well as peace officers, under circumstances which are the same but for the added fact that the homicide was accidental or unintentional, is entirely consistent with the justification statute.

The rule which we adopt is not only consistent, but it is the better rule. It has been argued that to allow laymen to use deadly weapons in attempting to capture fleeing felons presents a grave danger that innocent men will be killed. We think this danger is minimized by the fact that the private citizen cannot successfully use the excuse statute in defense against a manslaughter charge, simply by asserting that he *thought* the person fleeing had committed a felony. In the case at bar, at least, appellant did not mistakenly shoot at an innocent man.

---

[1] Discussion concerning the merits of the above rule begins on page 55 of Tentative Draft No. 8 of the Model Penal Code, which contains an extensive discussion of the entire section.

Furthermore, in this case the man who was killed could have avoided the risk simply by choosing to submit to arrest rather than running away. The decedent had not only assaulted a patron of the tavern with a deadly weapon just outside the front door but was still brandishing the knife and threatening to kill all patrons who came outside.[2]

To forbid the private ctizen to use deadly force upon a fleeing felon could only encourage flight, because the criminal would have nothing to lose (*i.e.* he would incur no additional risk) and possibly freedom to gain by attempting to escape. We think that a rule which encourages escape attempts presents a greater danger to society than a rule which permits laymen to use deadly weapons in attempting to uphold the law. If the legislature wishes to establish a different rule, of course, it may do so.

Excuse or justification is a defense to a charge of manslaughter. If the use of deadly force appeared necessary to effect the arrest of a fleeing felon, and appellant exercised ordinary caution without the intent to inflict death, the homicide in the instant case was excusable. These are questions for the jury to decide, and since they were not presented with those questions under the instructions given, a new trial upon a charge of manslaughter is necessary. The other errors assigned require no additional discussion.

The judgment of the trial court is reversed, and the case remanded for a new trial conducted in accordance with the views expressed herein.

FINLEY, C. J., OTT, HUNTER, and HAMILTON, JJ., concur.

---

[2]As to the civil liability of a tavern owner to protect his patrons during fights in his establishment, see *Miller v. Staton*, 58 Wn. (2d) 879, 365 P. (2d) 333 (1961).