# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>     Respondent,<br><br> v.<br><br>STEVEN MICHAEL MCMILLIN,<br><br>     Appellant. | DIVISION ONE<br><br>No. 87076-9-I<br><br>UNPUBLISHED OPINION |

DWYER, J. — Steven McMillin appeals his convictions for kidnapping in the first degree and assault in the fourth degree. Contrary to McMillin's assertions, the State presented sufficient evidence to support the kidnapping conviction. However, the trial court erred under ER 803(a)(5) by allowing the prosecutor to read portions of a 911 call transcript into the record, and the error was not harmless with regard to either of McMillin's convictions. Accordingly, we reverse both convictions and remand for a new trial.

I

The morning of Saturday, November 21, 2020, a clerk at the office of the Econo Lodge motel in Tacoma called 911 and reported that "[a] lady," who later identified herself as Kimberly Boals, "just ran to the door" with her face "badly bruised" and "tape all in her hands," "saying that she was . . . kidnapped." According to Boals, she and her friends, Nicole Sanders and Jarod McCausland, had been held captive overnight in McCausland's motel room by a person Boals knew as "Mack," whom she later identified as McMillin.

In December 2020, the State charged McMillin with one count of kidnapping in the first degree and one count of assault in the second degree "by strangulation or suffocation."[1]  Boals would later testify at McMillin's trial that on Friday afternoon, November 20, 2020, she drove to the Econo Lodge to spend time with Sanders, an old friend she had not seen for some time.  She testified that for a few days, she had also been receiving texts from McCausland, who was staying at the Econo Lodge, about hanging out.  Boals testified that she went first to Sanders's room, where she smoked methamphetamine and made small talk with Sanders, her father, and her father's friend, "Kyle."  She and Sanders then left for McCausland's room, and although Boals gave Sanders's father and Kyle the room number, it was the wrong one.

When Boals and Sanders knocked on McCausland's door, Boals expected McCausland to answer, but instead it was answered by McMillin.  According to Boals, McMillin "forcibly pulled [her] in and dragged [her] into the room," followed by Sanders.  Boals testified that, in the room, there was "a tall table desk that was blocked off on all sides by a bicycle and other objects, and . . . [McCausland] was underneath there, . . . like a little dungeon kind of."  Sanders similarly testified that McCausland was underneath the table, "kind of barricaded," and that it appeared he was there involuntarily.  Boals testified that she and Sanders sat on the bed and that she was scared, anxious, and crying.  Sanders, meanwhile, was telling Boals that "she should . . . just be quiet . . . so that she wouldn't get hurt."

---

[1] The State also charged McMillin with a second count of first degree kidnapping; however, that charge was later dismissed with prejudice and is not at issue in this appeal.

2

According to Boals, McMillin directed her to lie on the floor, and when she would not "shut up and control [her]self," he duct taped her hands and mouth. Boals testified that at some point during the night, she had to go to the bathroom, and McMillin allowed Sanders to help her because her hands remained taped. She testified that after Sanders left the bathroom, she put her hands in the toilet and was able to get one hand free. She then ran from the bathroom to the motel room door and tried to open it, but McMillin caught her. Boals testified that McMillin then struck her in the eye and strangled her.

Boals eventually escaped early the following morning, while everyone was asleep. She testified that she ran out through the motel room door and down the stairs to the motel office, where the clerk called 911 for her. McMillin was no longer in McCausland's room when police responded. Boals believed McMillin left in her car because he had her keys, and the car was no longer where she had parked it when she later looked for it. Police arrested McMillin on November 29, 2020, after Boals called 911 to report that she saw him parked outside her house in her car.

McMillin, for his part, admitted that he was in McCausland's room on Friday, November 20, 2020. However, he denied that he held anyone captive or assaulted Boals and strangled her when she tried to escape. Instead, McMillin testified, Boals needed money and agreed to sell her car to him. McMillin asserted that he paid Boals $500 for the car and left in it about 45 minutes to an hour after Boals and Sanders arrived. McMillin's defense theory was that Boals fabricated her accusations against him so that she could "have her cake and eat

it too by getting her car back" while keeping the $500. To that end, McMillin's friend, Shawn Fitzpatrick, testified that McMillin showed up at his house early Friday afternoon and stayed until the following morning.

McCausland also testified at McMillin's trial. When the prosecutor asked him if he remembered seeing anyone in the courtroom on November 20, 2020, McCausland answered, "I don't think so on that particular day." The prosecutor then asked McCausland if he knew Mack and whether Mack was in the courtroom. McCausland answered affirmatively but then testified that he did not believe he saw Mack in his motel room on the day of the incident.

The prosecutor then handed McCausland a document that had been marked for identification as Exhibit 18, a transcript that, according to the prosecutor, was of a non-emergency 911 call "that [McCausland] made shortly after an incident where someone was held captive at [his] place." The prosecutor stated that he would "lay[ ] a foundation for past recollection recorded" and asked McCausland some preliminary questions about the call. The prosecutor then indicated that he planned to read excerpts of the transcript and directed McCausland "to go ahead and let me know if I read them correctly." McMillin's counsel objected, stating, "[T]his is hearsay. The foundation has not been laid for past recollection recorded." The trial court overruled the objection and the prosecutor read parts of Exhibit 18 into the record,[2] including the following excerpts where the transcript indicated McCausland was speaking:

> "I -- I was actually kind of held captive and -- and -- and robbed.
> Um, and there was a -- there was a woman in the room that
> actually escaped from the -- the -- the kidnapper or whatever you

---

[2] Exhibit 18 was not itself admitted.

4

call him. But, um, she's the one that called the police, and she had been beaten up pretty badly, but I -- I'm kind of at a loss and not knowin' what to do exactly. Um, I have -- I have a phone that doesn't work.

. . . .

Well, there is some places I know this guy would be. Um, he pretty much should be caught and put away, uh, for what he did to that girl. Um, and I'm -- I'm still not real stable in my circumstances. Um, you know, I lost all of Friday in bein' held hostage in my room. Um, my phone was the first thing taken. I was hit in the knee with the sledgehammer and hit in the foot with the sledgehammer, um --

. . . .

I didn't show [the police] my knee. I -- I didn't say that I'd been hit by the sledgehammer. Um, the sledgehammer is still here. It's not mine but it's -- it's in my possession. And, um, you know, I've been havin' thoughts of, you know, if I see that guy again, just takin' it straight to his head right off the gate. Um, I -- I -- I'm a little bit traumatized by the circumstances.

. . . .

I mean, I -- I -- I feel bad for the girl that got beat up. I mean, um, he seriously was probably out to kill her. I -- it really feels like it, um, you know, especially -- especially after she escaped yet and then went and called. I'm sure he knows. Um, my life's really not safe, um, besides the way that I'm actually feeling kinda, you know, like retaliation is -- is somethin' -- it -- it seems like is the only thing that can -- can help me."

The prosecutor also read an excerpt where the transcript indicated that McCausland identified the kidnapper as "Mack" and the victim as "Kimberly Boyles."

The jury found McMillin guilty of kidnapping in the first degree. It did not reach a verdict on the charge of assault in the second degree, but it found him guilty of the lesser included offense of assault in the fourth degree. McMillin appeals.

5

II

McMillin argues that the State did not present sufficient evidence to support his conviction of kidnapping in the first degree. We disagree.

A

Evidence is sufficient to support a conviction if it permits any reasonable trier of fact to find the essential elements of the crime beyond a reasonable doubt when viewed in the light most favorable to the State. State v. Condon, 182 Wn.2d 307, 314, 343 P.3d 357 (2015). "In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it." State v. Drum, 168 Wn.2d 23, 35, 225 P.3d 237 (2010). While "we are not required to ignore unfavorable facts," State v. Davis, 182 Wn.2d 222, 235, 340 P.3d 820 (2014) (Stephens, J., dissenting),[3] we must "defer to the fact finder on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." State v. Ague-Masters, 138 Wn. App. 86, 102, 156 P.3d 265 (2007).

B

RCW 9A.40.020 provides that "[a] person is guilty of kidnapping in the first degree if he or she intentionally abducts another person" with "an additional specific intent" enumerated in the statute. State v. Garcia, 179 Wn.2d 828, 838, 318 P.3d 266 (2014); cf. RCW 9A.40.030 (defining second degree kidnapping as an intentional abduction *without* the additional specific intent).

---

[3] In Davis, the dissenting opinion garnered a five-justice majority on the issue of sufficiency of the evidence. See 182 Wn.2d at 233 (Wiggins, J., concurring in part and dissenting in part).

The State alleged that McMillin committed kidnapping in the first degree under RCW 9A.40.020(1)(c) by intentionally abducting Boals "with intent to inflict bodily injury" on her. To prove an intentional abduction, the State needed to prove that McMillin "restrain[ed Boals] by either (a) secreting or holding . . . her in a place where . . . she is not likely to be found, or (b) using or threatening to use deadly force." RCW 9A.40.010(1). McMillin contends that reversal is required because the State did not present sufficient evidence to prove both of these means of abduction. He is mistaken.

i

McMillin argues that the State failed to present sufficient evidence that he secreted or held Boals in a place where she was not likely to be found. He points out that Boals was with McCausland and Sanders throughout the incident and they "did not try to restrain her." Br. of Appellant at 21. Relying on State v. Green, 94 Wn.2d 216, 616 P.2d 628 (1980), McMillin asserts that "[w]hen a person is partly visible to others, they are not hidden in a place where they are unlikely to be found." Br. of Appellant at 20.

Green does not support that assertion. In Green, defendant Michael Green accosted his victim, 8-1/2-year-old Kelly Emminger, while she was walking with another child down an alley adjacent to the apartment complex where both children lived. 94 Wn.2d at 222. Green stabbed Emminger on a sidewalk adjacent to the alley, then carried her around the corner of the apartment building to an area near the entrance of the building's exterior loading area. Green, 94 Wn.2d at 224, 228. Green was convicted of aggravated murder in the first

7

degree committed in furtherance of kidnapping or rape, and on appeal, he

argued that the evidence was insufficient to prove that he restrained Emminger

by secreting her in a place where she was not likely to be found.  See Green, 94

Wn.2d at 219, 225.

Our Supreme Court agreed with Green.  See Green, 94 Wn.2d at 228.  In

doing so, it observed that

> [t]he area where the State asserts the victim was "secreted," i.e.,
> the apartment's exterior loading area, had no outside doors, was
> visible from the children's play area and a tire swing located only
> about 30 feet away, and could be viewed from the rear windows of
> another apartment only about 40 feet distant.  In short, the exterior
> loading area was plainly visible from the outside.  Additionally, the
> apartment's first floor rear exit, or fire door, opened into one end of
> the exterior loading area only a few feet from where [a witness]
> observed Green and the victim.  This door provided additional
> public access to the area.  Further, the place where Green and the
> victim were found was near the bottom of the back stairway which
> led to all of the upstairs apartments.  This stairway was used in
> common by the occupants of and visitors to the apartments.
> Finally, at best, a total of only 2-3 minutes elapsed from the time
> the victim first screamed to the time [a witness] reached the exterior
> loading area and actually saw [Emminger] in Green's arms.

Green, 94 Wn.2d at 226.  The court held that given "the unusually short time

involved, the minimal distance the victim was moved . . . , the location of the

participants when found, *the clear visibility of that location from the outside as*

*well as the total lack of any evidence of actual isolation from open public areas*,"

the evidence was insufficient to prove that Green secreted Emminger in a place

where she was not likely to be found, and "it is clear Green *could hardly have*

*chosen a more public place to accost his victim* or commit the homicide."  Green,

94 Wn.2d at 226 (emphasis added).

Here, unlike in Green, the evidence showed that Boals was held *inside* a

private motel room, which—unlike an *exterior* loading area—was not a public place, had a door that separated it from open, public areas, and would not have been plainly visible from the outside. Although McMillin points out that (1) the motel complex itself was on a public road close to a highway and Sanders testified that the room's sliding glass door was open, (2) Boals gave Sanders's father and his friend an incorrect room number before going to McCausland's room, (3) McCausland and Sanders were also present in the room while Boals was held captive, and (4) at one point, "a maintenance guy" came into the room to retrieve a "weed pipe" that he'd left there, nothing in Green compels the conclusion that the inside of McCausland's room was a place where Boals *was likely to be*—as distinct from *could plausibly be*—found. McMillin's reliance on Green is misplaced.

So, too, is McMillin's reliance on this court's unpublished opinion in State v. Perkins, No. 82291-8-I (Wash. Ct. App. March 14, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/822918.pdf.[4] There, Kevin Perkins grabbed N.M. while she was on her evening run, placed her in the driver's seat of his car, which was parked on the side of the road, and tried to move her to the passenger side. Perkins, No. 82291-8-I, slip op. at 4-5. In holding that the evidence was insufficient to support Perkins's kidnapping conviction, we reasoned that the incident took place along a busy public road while it was not dark out, N.M.'s mother knew that she had gone out for a run and her sister knew the area as one they had run together, and "[a]fter Perkins grabbed her, N.M.

---

[4] Although this opinion is unpublished, we cite it under GR 14.1(c) as necessary for a reasoned decision.

was never fully in the car; she was able to keep herself out of the passenger seat and keep her legs outside the vehicle with the driver's side door open." Perkins, No. 82291-8-I, slip op. at 5.

Nevertheless, we remanded for the trial court to enter judgment on the lesser included offense of attempted kidnapping because Perkins attempted to move N.M. to the passenger seat. Perkins, No. 82291-8-I, slip op. at 6. That is, had Perkins successfully moved N.M. into the passenger seat, he would have completed a kidnapping—even though the incident still would have taken place on a busy public road, while it was still light out, in an area where N.M. was known to be running. See Perkins, No. 82291-8-I, slip op. at 4 (citing State v. Billups, 62 Wn. App. 122, 127, 813 P.2d 149 (1991), for the proposition that had the victims in that case gotten into the defendant's van, they would have been secreted or held in a place where they were not likely to be found). Accordingly, Perkins does not persuade us that the State failed to present sufficient evidence to prove that McCausland's motel room was a place where Boals was not likely to be found.[5]

ii

McMillin also argues that the State failed to present sufficient evidence that he restrained Boals by using or threatening to use deadly force. Again, we

---

[5] Neither do the out-of-state cases that McMillin cites involving (1) a victim who was held in her own home in a bedroom where her older sister, who was also home, had directed the victim to go, State v. Parkins, 346 Or. 333, 343, 211 P.3d 262 (2009); (2) a location where the victim "was known to frequent" and where, in fact, a friend inquired about the victim, and a second location where the victim remained for several days, apparently voluntarily, after the defendant left—all under circumstances that also did not amount to "secreting" or "holding," In re Luis V., 628 N.Y.S.2d 60, 61 (1995); and (3) a convenience store clerk who was held at her place of work, in an area of the store visible to anyone using the restrooms, which were open to the public. Beeman v. State, 828 S.W.2d 265, 267 (Tex. Ct. App. 1992).

disagree.

The statute that defines abduction does not define "deadly force." However, our Supreme Court has defined deadly force as "force which is capable of, and entails great risk of, killing," State v. Clarke, 61 Wn.2d 138, 142, 377 P.2d 449 (1962), and the jury was so instructed. Here, Boals testified that the first time she tried to escape from the motel room, she almost got the door open, but McMillin slammed it closed and struck Boals in her left eye. McMillin contends that "[t]here was no evidence that this force was reasonably likely to cause death." Br. of Appellant at 29. He also asserts that "[n]o one described verbal threats that [McMillin] would use deadly force." Br. of Appellant at 29.

But McMillin cites no authority for the proposition that a threat to use deadly force must be verbal. Cf. RCW 9A.04.110(28) (providing that a "threat" can be communicated directly or indirectly). To this end, even if McMillin's striking Boals in the eye was not alone sufficient to constitute the use of deadly force, Boals also testified that she fell to the ground when McMillin hit her, and McMillin then got on top of her and put his hands on her neck and squeezed. And there was evidence that McMillin squeezed forcefully enough to leave red marks and bruising on Boals's neck. As McMillin points out, the jury did not find him guilty of assault in the second degree by strangulation. Nevertheless, when viewed in the light most favorable to the State, evidence that McMillin struck Boals in the eye hard enough that she fell to the ground, then got on top of her and forcefully squeezed her neck, was sufficient to support a finding that McMillin restrained Boals by *threatening* to use deadly force. Cf. State v. Majors, 82 Wn.

App. 843, 847, 919 P.2d 1258 (1996) ("In our view, one does not have to have the actual capability to inflict deadly force in order to *threaten* to use it within the meaning of abduction.").

C

McMillin next contends that the State did not present sufficient evidence of his specific intent to inflict bodily injury on Boals as required for kidnapping in the first—as distinct from the second—degree. This is so, McMillin asserts, because "[e]ven assuming the prosecution proved Mr. McMillin abducted Ms. Boals by the use or threat of deadly force, there was not separate evidence he acted with the added intent to inflict bodily injury." Br. of Appellant at 35-36.

Not so. Sanders testified that during the underlying incident, McMillin was saying to Boals that she "owed him, like, $2,000 or something, and she thought that she already made payments or whatnot -- or at least made some payments towards it." Sanders testified that McMillin "was telling her, no, you haven't"; and that she thought "that's what got the whole thing kind of going." She testified that when Boals would talk, McMillin would "threaten her with, you know, either hitting her or -- or something," and that McMillin "would react" if Boals did something he didn't like "or he didn't like her answer."

Meanwhile, Boals testified that McMillin made her "lay on the floor in front of the dresser" and that she had to "lay on [her] stomach, not making any noise," and "just, you know, take it, basically." She also testified that when she was on the floor on her belly and "wouldn't shut up," she "got hit with, like, a wood stick or a metal." She testified, "I don't know if it was rubber or a metal mallet,

12

because I was being struck with it . . . . I don't recall seeing knives coming at me or anything like that, but it was mostly just objects of, like, to strike somebody." Later, when Boals went to the emergency room for her injuries, she reported that McMillin "'physically assaulted her, striking her in the face multiple times with a fist.'" She also reported that McMillin "'held her on the ground and kicked her in the back.'"

The foregoing evidence is distinct from the evidence supporting a finding that McMillin threatened to use deadly force to hold Boals in the motel room. And, it supports an inference that McMillin did so with the specific intent to—and that he did—inflict bodily injury on Boals in relation to a dispute over money owed.

McMillin's challenges to the sufficiency of the evidence do not entitle him to relief.

III

McMillin next contends that the trial court erred under ER 803(a)(5) by allowing the prosecutor to read parts of Exhibit 18 into the record. We agree.

A

As a general rule, hearsay is not admissible. ER 802. "Hearsay" is "a statement, other than one made by the declarant while testifying at the trial . . . , offered in evidence to prove the truth of the matter asserted." ER 801(c). Under ER 803(a)(5), the hearsay exception for "recorded recollections," "[a] memorandum or record concerning a matter about which a witness once had knowledge" is admissible if the witness "now has insufficient recollection to

13

enable the witness to testify fully and accurately" and the memorandum or record is "shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly." "If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party." ER 803(a)(5).

Whether or not a statement is hearsay is a question of law that this court reviews de novo. State v. Edwards, 131 Wn. App. 611, 614, 128 P.3d 631 (2006). We review a trial court's ruling on a hearsay objection for an abuse of discretion. State v. Mason, 160 Wn.2d 910, 922, 162 P.3d 396 (2007).

B

Admission of a recorded recollection under ER 803(a)(5) is proper when four factors are met:

> (1) the record pertains to a matter about which the witness once had knowledge; (2) the witness has an insufficient recollection of the matter to provide truthful and accurate trial testimony; (3) the record was made or adopted by the witness when the matter was fresh in the witness' memory; and (4) the record reflects the witness' prior knowledge accurately.

State v. Alvarado, 89 Wn. App. 543, 548, 949 P.2d 831 (1998).

Here, the trial court did not abuse its discretion by finding that the first two factors were satisfied, i.e., that the 911 call transcript pertained to a matter McCausland once had knowledge of but about which he lacked a sufficient recollection at trial to provide truthful and accurate testimony—namely, the events of November 20, 2020. In particular, when the prosecutor asked McCausland, "Is it fair to say that you don't have a great memory of what

14

happened that night," McCausland responded, "Yeah. It was a long time ago" but confirmed that he was in his motel room that night. He also testified that the events of November 20, 2020 "must have been" more fresh in his memory when he made the underlying 911 call than they were at trial.

However, McCausland did not make the 911 call transcript, and the State presented no evidence that McCausland adopted the transcript while the events of November 20, 2020 were fresh in his memory. Indeed, as McMillin points out, McCausland testified that he did not remember making the call, and it appears from the record that he saw the transcript for the first time at trial and was not given time to review the whole thing. McCausland could not validly adopt the transcript at trial given his testimony that he did not have a great memory of the underlying incident, which took place more than two years earlier. And with a questionable memory of that incident, McCausland also could not testify that the transcript—which he did not prepare—"reflect[ed his] prior knowledge accurately." Alvarado, 89 Wn. App. at 548. In short, the final two factors for admissibility under ER 803(a)(5) were not satisfied, and the trial court erred by allowing the prosecutor to read from the 911 call transcript.

The State disagrees and points out that McCausland testified that he made the 911 call while the events of November 20, 2020 were still fresh in his memory and acknowledged that he would have given an accurate account when speaking with someone "that's essentially from law enforcement." But the State's observations blur the distinction between the record that was presented to the jury—i.e., the transcript of McCausland's 911 call—and the underlying call itself.

The transcript consisted of double hearsay—the "inner" level being McCausland's statements, and the "outer" being the transcript of those statements.  It appears that both the parties and the trial court conflated the two levels, but it is fundamental that hearsay within hearsay is admissible only if each level of hearsay is independently admissible.  ER 805.  McCausland's testimony about *the underlying call* did not lay a proper foundation under ER 803(a)(5) for *the transcript*, and the trial court abused its discretion by overruling McMillin's hearsay objection.  Cf. 5C KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 803.30 at 91 (6th ed. 2016) (where one person records information supplied by a second person, "it may be necessary to offer the testimony of both persons to satisfy the requirements of [ER 803(a)(5)].").

The State also argues that even if the trial court erred, any error was harmless.  This is so, the State asserts, because "[b]y its finding that [McMillin] was guilty of kidnapping in the first degree, the jury necessarily found Ms. Boals' version of events credible."  Br. of Resp't at 44.  As the State implicitly acknowledges, this case turned on whose account of events the jury found more credible: Boals's or McMillin's.  To that end, the State also acknowledges that although the 911 call transcript was consistent with Boals's account, McCausland later testified that he did not see anyone get assaulted or hurt in his motel room, that it was his decision to stay in his room, and that he was not required to stay under the table but "was probably trying to stay under there on my own . . . to sleep it off."  This testimony was consistent with McMillin's account.  By finding McMillin guilty of both assault and kidnapping, the jury necessarily discounted

this testimony in favor of the transcript excerpts that corroborated Boals's testimony.  Under the circumstances, we cannot conclude that the prosecutor's reading of those excerpts did not materially affect the outcome of trial within reasonable probabilities—either on the assault count or the kidnapping count. Accordingly, the trial court's error was not harmless.  Cf. State v. Slocum, 183 Wn. App. 438, 456, 333 P.3d 541 (2014) (under nonconstitutional harmless error standard, "the question is whether within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred").

We reverse McMillin's convictions and remand for a new trial.[6]

Dwyer, J.

WE CONCUR:

Birk, J.        Chung, J.

---

[6] In light of this disposition, we need not and do not reach the remaining issues McMillin raises on appeal.